2020 IL App (1st) 163245

No. 1-16-3245

Filed August 13, 2020

Fourth Division

---

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

---

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 11 CR 9070 (02) |
| | ) | |
| AMELIA CARR-McKNIGHT, | ) | Honorable |
| | ) | Mauricio Araujo, |
| Defendant-Appellant. | ) | Judge presiding. |

---

JUSTICE BURKE delivered the judgment of the court, with opinion.
Justices Lampkin and Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1 Following a jury trial, defendant Amelia Carr-McKnight was found guilty of first degree murder and home invasion. The trial court sentenced her to 30 years' imprisonment for first degree murder and to 21 years' imprisonment for each of her two home invasion convictions. The sentences for home invasion were concurrent to one another, but consecutive to the murder conviction, resulting in a total of 51 years' imprisonment. On appeal, defendant contends that (1) the evidence was insufficient to convict her of the offenses, (2) the trial court erred in allowing the State to impeach her credibility with her prior misdemeanor theft conviction and the

State inappropriately impeached her with the conviction on cross-examination, (3) her estranged husband was improperly allowed to testify about two statements she made to him regarding her role in the offenses, (4) the trial court erred when it allowed the State to publish three autopsy photographs of the murder victim, and (5) the trial court improperly restricted her closing argument. For the reasons that follow, we vacate the conviction and sentence for home invasion, but affirm in all other respects.

¶ 2                                    I. BACKGROUND

¶ 3      A grand jury indicted defendant and codefendant Marvell Fisher with 33 counts of first degree murder, 3 counts of armed robbery, 6 counts of home invasion, and 8 counts of residential burglary, all in connection with the shooting death of Jamar Conner on April 14, 2011. Defendant and Fisher had separate trials.[1] The State proceeded to trial against defendant on five counts in the indictment: three counts of first degree murder (counts I, II, and IV) and two counts of home invasion (counts XXXVII and XXXVIII).

¶ 4      Count I alleged that defendant and Fisher committed first degree murder in that they, without lawful justification, intentionally or knowingly shot and killed Conner while armed with a firearm. Count II alleged that defendant and Fisher committed first degree murder in that they, without lawful justification, shot and killed Conner while armed with a firearm knowing that such an act created a strong probability of death or great bodily harm to him. Count IV alleged that defendant and Fisher committed first degree murder in that they, without lawful justification, shot and killed Conner while armed with a firearm during the commission of a home invasion. Count XXXVII alleged that defendant and Fisher committed a home invasion in that they,

_____

[1]Fisher had a bench trial and was convicted of felony murder. The trial court sentenced him to 44 years' imprisonment, and he unsuccessfully appealed his conviction in *People v. Fisher*, 2018 IL App (1st) 160044-U.

without authority and while armed with a firearm, knowingly entered Arkyisha Sloan-Carr's residence, knew or had reason to know that one or more people were present, and used force or threatened the imminent use of force upon Sloan-Carr within her residence. Count XXXVIII alleged that defendant and Fisher committed home invasion in that they, without authority and while armed with a firearm, knowingly entered Sloan-Carr's residence and knew or had reason to know one or more people were present, and they used force or threatened the imminent use of force upon Conner within her residence.

¶ 5                                  A. The State's Case

¶ 6       Arkyisha Sloan-Carr testified that, in April 2011, she was receiving social security disability checks through the mail as the payee on behalf of her estranged husband, Cedric Carr, who at that time was in county jail.[2] Arkyisha and Cedric were the parents of two young children. Originally, Cedric's father was Cedric's payee, but later Cedric changed the payee to Arkyisha because he did not trust his father. After Arkyisha became Cedric's payee, he was arrested and placed in county jail. Once there, Arkyisha was supposed to cash his check and deposit the money in his name at the county jail. Despite this arrangement, Arkyisha used the money to support herself and their two children. All told, after Arkyisha became Cedric's payee, she kept the majority of the money and only provided him with $100. Although at one point during the trial, Arkyisha acknowledged not being entitled to the money, she also testified that she kept the majority of the money because she and Cedric "both agreed *** that we were going to take care of our two children together with the rest of the money."

_____

[2] Given that many people involved in this case have the same or similar last names, many of the people involved with be referred to by their first name.

¶ 7 During April 2011, Arkyisha was living with her boyfriend, Jamar Conner, and her two children in a third-floor apartment located on the 7600 block of South Kingston Avenue in Chicago. Although Arkyisha was still married to Cedric, she had "kicked" him out of the apartment months before she had met Conner, which was some time during the winter of 2010 or 2011. During the first week of April 2011, Arkyisha checked her mailbox to see if she received the usual social security disability check, but it never arrived. As a result, Arkyisha contacted the social security office and had them reissue the check. Around this time, defendant, who was Cedric's sister, came to Arkyisha's apartment and inquired about the check. Their conversation "started to escalate" because defendant wanted Arkyisha to cash the check she did not have. After informing defendant of this, Arkyisha told defendant to leave, which she did. At that time, defendant was legally married to Rick McKnight, but they had been separated for two years. They had multiple children together, including Brandon, Ricky and 10-year-old Jeremiah. The children lived with defendant and Rick at various times.

¶ 8 In the morning of April 14, 2011, Arkyisha received the reissued social security disability check. Later in the day, Jeremiah was at his grandmother's house with defendant; defendant's boyfriend, Marvell Fisher; Ricky; Brandon; and other family members. Jeremiah left his grandmother's house with defendant, Fisher, Ricky and Brandon to go to Arkyisha's residence. Ricky drove and parked in front of Arkyisha's apartment building. According to Jeremiah, all five of them entered the apartment building, though Ricky stayed "downstairs" and Brandon stayed on the second floor. Meanwhile, Jeremiah, defendant and Fisher went up to the third floor. Jeremiah stayed by the stairway while defendant and Fisher went to the front door of an apartment.

¶ 9    It was around 3:40 p.m., and Arkyisha, Conner and her children were in their apartment. Arkyisha and Conner were watching television in their bedroom, while her children were taking naps in another bedroom. Arkyisha heard a knock at the front door of her apartment, went to the door, looked through the peephole, and observed defendant and Jeremiah. Arkyisha walked back toward the bedroom and told Conner that it was defendant at the door and to ignore her, thinking that defendant would eventually leave. According to Jeremiah, after defendant knocked and received no answer, she tried to hear if anyone was inside. Jeremiah heard noises and what appeared to be arguing inside. Meanwhile, Arkyisha observed Conner stand up, walk to the door and open the door a little bit. Both Arkyisha and Jeremiah observed that Conner began to have a conversation with defendant. Defendant asked Conner where Arkyisha was, but Conner asserted that Arkyisha was not there. Defendant told Conner that she heard Arkyisha in the apartment, but Conner again asserted that Arkyisha was not there.

¶ 10    According to Arkyisha, after Conner, who had nothing in his hands, again asserted that she was not there, defendant suddenly "bum rushed" the door and entered the apartment followed by Fisher, both without permission. Immediately after defendant and Fisher were inside, Fisher began wrestling with Conner. Arkyisha grabbed Conner's cell phone to call the police. As she grabbed the phone, Arkyisha could not see defendant but observed that Fisher was beginning to overpower Conner near the front door. While Arkyisha attempted to "work" Conner's phone, which she had difficulty with because she did not know how to slide his phone up, she heard a gunshot. Arkyisha testified that she never had a firearm inside her apartment. After hearing the gunshot, she ran to her children's bedroom and locked the door.

¶ 11    Inside her children's bedroom, Arkyisha was able to open the phone and dial 911. Suddenly, defendant "kicked the door in" and grabbed the phone from Arkyisha's hand.

Defendant slammed the cell phone down, put it in her pocket, and began yelling about the social security disability check. Arkyisha described defendant as "going a little bit berserk." Although Arkyisha did not see where he came from, Jeremiah had entered the room. Defendant told him to "go get my gun" because she was "fitting to kill" Arkyisha. Shortly afterward, Arkyisha heard a young male voice say that someone had called the police. Upon hearing that, defendant looked at Arkyisha and said "I'll be back for you." Defendant and Jeremiah then left the apartment.

¶ 12    However, according to Jeremiah, after defendant told Conner that she heard Arkyisha in the apartment, Conner tried to shut the door on defendant. But defendant pushed back and forced her way into the apartment. Conner then "tried to hit" defendant, and they began fighting. Fisher followed defendant into the apartment and began fighting with Conner, as well. Jeremiah, meanwhile, stood by the front door. Although he really could not see what was happening, the fighting sounded more intense than just a scuffle. Sometime into the fighting, Jeremiah heard a gunshot. At trial, when asked who fired the gun, Jeremiah asserted that it was Fisher because when they had exited the vehicle driven by Ricky a few minutes earlier, Jeremiah observed "something in his hand." Jeremiah observed that defendant was near Fisher when the gunshot went off, but Jeremiah never observed her touch a firearm.

¶ 13    After hearing a gunshot, Fisher and Conner continued their fighting, which eventually moved outside the apartment and into a stairwell, where Jeremiah observed a bloodied Conner begin to fall down the stairs. After witnessing this, Jeremiah went into Arkyisha's apartment and walked into a bedroom where defendant, Arkyisha, and her children were located. Appearing to be upset, defendant told Arkyisha that she had to "go cash this check." Arkyisha refused, so defendant and Jeremiah left the apartment. At trial, Jeremiah denied that defendant ever asked him to retrieve a firearm. Upon exiting the apartment building, Jeremiah observed Conner on the

ground bleeding and barely moving, appearing as if "he was dead." At some point after defendant and Jeremiah exited the apartment building, Brandon rejoined them, and all three of them entered a vehicle being driven by Ricky. Fisher, however, was not with them, and Jeremiah did not see him again that day.

¶ 14    Linda Stephens was visiting a friend who lived on the 7600 block of South Kingston Avenue. While walking toward the friend's vehicle, Stephens observed Conner lying on the ground. Stephens also observed another man crossing the street, who told her that someone should call 911. Although Stephens did not pay much attention to this man, she could not recall seeing anything in his hands. As Stephens walked up to Conner, she noticed that he was bleeding. Stephens tried to talk to him, but every time he tried to respond, blood would gush out of his mouth. As Stephens called 911, she observed a woman and a young boy exit the nearby apartment building. Stephens asked the woman if she knew the man, but she said no, and she continued walking away from the apartment building.

¶ 15    Meanwhile, after defendant and Jeremiah left the apartment, Arkyisha remained in the bedroom for a minute because she did not know if defendant would return. When Arkyisha walked out of the bedroom, she began calling for Conner but did not see him anywhere in the apartment. Arkyisha walked out of her apartment and down a flight of stairs to the second-floor landing. From the landing, Arkyisha looked through a window, observed Conner's body on the ground, and noticed he was coughing up blood. Arkyisha ran down to where Conner was lying, and Stephens allowed Arkyisha to talk to the 911 operator. Stephens left the scene a few minutes later.

¶ 16    Defendant, Jeremiah, Ricky, and Brandon drove away from Arkyisha's apartment building and toward Rick's apartment. On the way, defendant told Jeremiah and Brandon to tell

Rick the truth about what happened. According to Rick, around 4 or 4:30 p.m. that day, he received a phone call from defendant, who told him that she was bringing Jeremiah and Brandon home early and to bring down a shirt for her. This was not an unusual request to Rick because defendant's clothing was still at his house. Additionally, defendant told Rick that "Marvel shot him." Rick knew "Marvel" to be defendant's boyfriend. Rick grabbed a shirt from his apartment, and about 5 to 10 minutes later, he went downstairs and observed defendant, Brandon, and Jeremiah in a vehicle driven by Ricky. Jeremiah and Brandon exited the vehicle and walked toward Rick's apartment, but Ricky and defendant stayed in the car. Rick and defendant swapped shirts, and defendant asked Rick "to take a gun." As defendant made this request, Rick observed her reach down between the seats and attempt to grab an object that was completely wrapped in clothing. Rick refused, though he never actually saw a firearm, resulting in defendant becoming angry with him. Before defendant left, she told Rick that she was going "to pick up Marvel." Defendant and Ricky drove away, and Rick returned to his apartment. Three or four hours later, defendant and Rick had another phone conversation, wherein she stated that she "was going to tell the police that she shot the victim due to the fact she tried killing herself and they might go lenient on her." Rick was "shocked" and did not respond. Additionally, according to Jeremiah, at some point after the shooting, defendant told him to tell the police that she was the one who shot Conner because she wanted to protect Fisher.

¶ 17    Shortly after the 911 call from Stephens, paramedics arrived at Arkyisha's apartment building. Although Arkyisha wanted to remain outside, a paramedic told her to return to her apartment, where she remained until the police came to talk with her. The police then arrived at the scene and began to investigate the shooting.

¶ 18    Chicago Police Detective James Scannell arrived and observed blood in front of the apartment building, on the sidewalk leading into the building, and in the stairwell leading up to the third floor. Once Detective Scannell arrived on the third floor, he spoke to Arkyisha, who informed him that two people had entered her apartment. In addition to providing descriptions of these people, she provided Detective Scannell with the name "Pam Carr." Chicago Police Officer Joseph Serio also arrived at the scene and began processing it for evidence. At around 6 p.m., based on a request from Detective Scannell, Officer Serio performed a gunshot residue test on Arkyisha. According to Arkyisha, she had not washed her hands before taking the test. Although Detective Scannell did not view Arkyisha as a suspect, he made this request as an elimination technique to make sure she had not used a weapon.

¶ 19    After interviewing Arkyisha in her apartment, Detective Scannell went to Northwestern Hospital, where paramedics had transported Conner. Connor, however, had passed away. At the hospital, Officer Serio also performed a gunshot residue test on Conner. An autopsy revealed that Conner died as a result of a single gunshot that entered his right arm which then pierced part of his right lung and heart. Dr. Steven White, an assistant medical examiner at the Cook County Medical Examiner's Office, testified at trial that he reviewed the autopsy report of Conner that had been authored by another doctor in the office, who had since left. According to Dr. White, there was no evidence that Conner had been shot from "close range," or from within 24 inches, nor was there evidence that Conner had been involved in a prolonged fight. Dr. White asserted that the manner of death was a homicide. During the autopsy of Conner, one bullet was recovered from his body. Both gunshot residue tests performed on Arkyisha and Conner came back negative, meaning they may not have discharged a firearm. At trial, Robert Berk, a trace evidence analyst for the Illinois State Police, noted that, for various reasons, gunshot residue may

not be detected even if someone had, in fact, discharged a firearm. After visiting Northwestern Hospital, Detective Scannell relocated to the police station to continue his investigation. He learned that "Pam Carr" used a different name and was able to obtain a photograph of her. Arkyisha came to the police station, viewed a photo array, and identified defendant. As a result, Detective Scannell issued an investigative alert for defendant.

¶ 20 The following day, Detective Scannell visited a residence associated with defendant, but she was not there. That same day, Detective Scannell interviewed Stephens and had her view a photo array. In the array, Stephens wrote the word "maybe" and signed her initials on a photograph of defendant, explaining that she thought that was possibly the same person she observed leaving the apartment building the previous day. According to Stephens, the woman in the photo array had short hair whereas the woman she observed the previous day had long hair. Detective Scannell continued his investigation, and on April 22, 2011, he interviewed Rick and learned that defendant had a boyfriend named Marvell Fisher. Based on that information, Detective Scannell obtained a photograph of Fisher and confirmed with Rick that the man in the photograph was defendant's boyfriend. Afterward, Detective Scannell interviewed Jeremiah and Brandon separately, but both in the presence of Rick. Later that night, Arkyisha returned to the police station, where she viewed a photo array and positively identified Fisher. As Detective Scannell did with defendant, he issued an investigative alert for Fisher.

¶ 21 On May 10, 2011, Chicago police officers located defendant and Fisher together, arrested them, and brought them to the police station. Arkyisha again returned to the police station, where she viewed two separate lineups. In one, she identified defendant, and in the other, she identified Fisher. Stephens also came back to the police station, where she viewed a lineup and identified defendant as a woman who looked like the woman from April 14, 2011.

¶ 22    On May 12, 2011, Detective Scannell and other officers executed a search warrant at Rick's residence. The police found various items, including a photo identification of Cedric, who Detective Scannell subsequently interviewed and learned was defendant's brother. Rick and Detective Scannell both testified that, around the time the police had executed the search warrant, Rick told Detective Scannell that defendant had tried to give him a firearm on April 14, 2011. At trial, Detective Scannell conceded that this detail was not in a report that summarized his initial conversation with Rick, but Detective Scannell asserted that the detail was in a supplemental report he created in June 2011.

¶ 23    On May 13, 2011, Jeremiah testified before a grand jury that defendant had told him to lie to the police about what occurred the month prior, in particular to tell the police that he and defendant alone arrived at Arkyisha's apartment by bus. Further, defendant had told Jeremiah to say that when they went up to her apartment, they heard arguing and then observed Conner run out. Jeremiah explained that his mother instructed him to lie because she did not want to get Ricky or Fisher in trouble and that he went along with it because he did not trust the police. At trial, Jeremiah reiterated that the truth was that Ricky drove him, defendant, Fisher, and Brandon to Arkyisha's apartment in a car.

¶ 24                              B. Motion *In Limine*

¶ 25    Prior to the defense's case, the State filed a motion *in limine* to use defendant's prior conviction for misdemeanor theft for impeachment purposes. The parties deferred argument on the motion until right before defendant testified at trial. During that argument, the State described the circumstances that led to defendant's conviction and asserted that she had originally been charged with a felony for defrauding the State of Illinois of $19,000 by failing to report her income. The State remarked that she ultimately pled guilty to a misdemeanor on January 15,

2004, and was sentenced to three years' probation. The State posited that the conviction should be admissible to impeach defendant. Defense counsel argued that it should be deemed inadmissible because of the similarity between the prior conviction and the State's theory of her current case, which would result in too much prejudice against her.

¶ 26    Following argument, the trial court observed that defendant's prior conviction was less than 10 years old and theft was a crime of dishonesty. After observing that there was a balancing test, the court granted the State's motion and found the prior conviction admissible to impeach defendant.

¶ 27                                C. The Defense's Case

¶ 28    Brandon Carr-McKnight, defendant's 15-year-old son at the time of trial, testified that, on April 14, 2011, he was at his grandmother's house and then left with defendant, Fisher, and Jeremiah to take a bus to Arkyisha's apartment. After they walked into Arkyisha's apartment building, Brandon stayed on the first floor, as he always did, because he knew someone who lived in the building and would always go talk to that person. However, at trial, Brandon could not remember the person's name. Eventually, defendant came downstairs with Jeremiah and told Brandon it was time to go. Brandon observed that defendant looked "normal" and once they were together, they walked out of the building. Brandon did not observe anything unusual in front of the building, and Ricky came and picked them all up. Although they were supposed to go shopping, Ricky instead drove them to Rick's house.

¶ 29    Cedric Carr testified that he previously had been convicted of armed robbery and aggravated battery. In March 2011, Cedric was living with Arkyisha and their two children in the South Kingston Avenue apartment. They had lived in the apartment for about two years, though Cedric's name was not on the lease to the apartment, which was because Arkyisha received

housing vouchers. On March 16, Cedric asked defendant to go to his apartment and get his social security disability check from Arkyisha, who "was [his] payee," so that he could pay for an attorney. Cedric did not go himself because he was going to be turning himself into the police because they had a warrant out for him. According to Cedric, Arkyisha and defendant were friends, and Arkyisha agreed that she would give his money to defendant. Cedric also gave defendant his keys to get into the apartment. At trial, he initially stated that he was unsure why he did this, but later explained that he gave them to defendant so that she could "check on [his] wife and [his] daughters." In giving defendant the keys to the apartment, Cedric testified that he was giving defendant permission to enter the apartment.

¶ 30    On March 21, Cedric turned himself into the police, and he went to Cook County jail. There, defendant visited him, and Cedric asked her if she had obtained his money from Arkyisha. Defendant replied that she had not been able to do so. Cedric told defendant to go to his apartment and "make sure" that Arkyisha gave defendant his money. On April 14, Cedric was still in jail. The following month, multiple police officers came to talk with him, and they asked him about defendant, Arkyisha, and his social security disability check, but he denied knowing what they were talking about.

¶ 31    Defendant testified that both Jeremiah and Brandon were in special education classes and that Jeremiah could be "talked into things." In 2011, defendant was living at her mother's house with Jeremiah, Brandon, and her other children, as well as Fisher, though she was trying to move out because it was too crowded in the house. On March 16, 2011, defendant had a conversation with Cedric and told him that she would talk to Arkyisha and pick up "his check." To this end, Cedric gave defendant the keys to his apartment and his wallet, which included his identification

card. According to defendant, Cedric gave her his property because the police were looking for him, and eventually, he ended up in jail.

¶ 32    On April 8, 2011, defendant drove to Cedric and Arkyisha's apartment building with her cousin Demon. Defendant went to the apartment alone and began talking to Arkyisha in the hallway about Cedric's social security disability check and him being in jail. While they were talking, someone approached defendant from behind and choked her. This person also started swearing at defendant and Arkyisha. Defendant immediately began walking down the stairs and called Demon to tell him what happened. Demon, however, stayed in the car because he just had knee surgery and could not easily exit. After the call, defendant exited the apartment building and saw Arkyisha's mother with Arkyisha and Cedric's two children. As defendant attempted to tell Arkyisha's mother what happened, Arkyisha's mother said she "didn't give a f***" and "didn't care what happened." As defendant was walking back to Demon, she observed a police officer writing tickets across the street. Defendant began walking toward the officer, but Demon asked her where she was going. Defendant told him that she was going to tell the officer what happened, but Demon told her that he had drugs in the vehicle and did not want to go to jail. Defendant came back to the vehicle and they left.

¶ 33    Three days later, defendant visited Cedric in jail and informed him that she was unable to get the check. Defendant told Cedric that he would have to wait a few days because she could not go back to his apartment that week. Between April 8 and April 13, defendant never reported to the police what had occurred outside Arkyisha's apartment.

¶ 34    On April 14, defendant, Jeremiah, Brandon, and Fisher took a bus to Arkyisha's apartment building. She brought along Jeremiah and Brandon because they were going to go shopping afterward, and she brought Fisher because of what happened the previous week.

Defendant, Fisher, and Jeremiah went up to the third floor while Brandon stayed on the first floor because he wanted to talk to a friend. When defendant reached the third floor, she heard arguing from Arkyisha's apartment that sounded like one woman, which she recognized as Arkyisha's voice, and two men. Because of the arguing, defendant became "[w]orried," so she knocked on the door, but no one answered. Although Cedric had given defendant his keys to the apartment, defendant did not have the keys on her that day. Defendant continued to hear arguing, so she knocked again and a young man answered the door. Defendant asked the man if Arkyisha was home, but he said she was not. Defendant asked him again and said that she could hear Arkyisha's voice, and the man again said no. Defendant then yelled out to Arkyisha and asked if she was okay.

¶ 35    At first, defendant did not hear anything, but shortly afterward, Arkyisha came to the front door. The young man only opened the door part way, so defendant and Arkyisha began talking about Cedric being in jail and whether Arkyisha could come with her to cash his check. As they were talking, defendant put her foot in the door, but the man punched her in the face, causing her to stumble backward. Fisher then went into the apartment and began fighting with the man near the front door. Jeremiah, meanwhile, was behind defendant. At some point, defendant heard a loud bang like "someone slammed into the wall." Afterward, defendant observed that Fisher had the man against the wall, but then Fisher ran out of the apartment followed by the man.

¶ 36    Defendant, still worried about the initial argument she heard in the apartment, began looking for Arkyisha to make sure she was okay. Defendant then kicked open a door where she believed Arkyisha was located and observed her. Defendant, still frightened and hysterical from being punched, asked Arkyisha who the man was and why he had attacked her. Arkyisha did not

respond. Defendant testified that she never threatened Arkyisha or hit her, but she did tell Arkyisha that she would return so that she could get the money and help Cedric hire an attorney. Before leaving the apartment, Jeremiah used the restroom, but once he finished, defendant and Jeremiah left. After walking outside the apartment building, defendant observed the man that had punched her lying on the ground in a pool of blood. Defendant also observed Brandon with Ricky, who had come to the apartment building after Brandon called him. Although defendant did not see where Fisher had gone, she never observed him with a firearm. While defendant was getting ready to leave, Fisher called her and told her that he was going to stay behind.

¶ 37    Defendant, Brandon, Ricky and Jeremiah then left and drove to Rick's apartment, where Brandon and Jeremiah got out and went to Rick's apartment. After dropping Brandon and Jeremiah off, Rick came down to talk to defendant, and they began arguing. At trial, defendant denied ever asking Rick to hide a gun for her. A few days later, one of defendant's sisters told her that the man may have died and that the police were looking for defendant as a witness. During the conversation, defendant told her sister that she would take responsibility for whatever happened to the man instead of Fisher.

¶ 38                    D. Testimony Regarding Defendant's Prior Conviction

¶ 39    During the State's cross-examination of defendant, it asked her whether she had been previously convicted of theft. Before defendant could answer, defense counsel objected and requested a sidebar. During the sidebar, defense counsel moved for a mistrial and noted that the State was not allowed to ask defendant about the prior conviction during cross-examination. The State remarked that it would withdraw the question and noted in response to the mistrial request that the jury would still hear about the conviction in rebuttal. Similarly, the trial court observed that, while the method of impeachment was improper, it was "something that's going to come

out eventually" and "[i]t just came out improperly at the wrong time." The court accordingly denied the motion for a mistrial. Following the sidebar, the court instructed the jury to disregard the previous question by the State, and the State continued its cross-examination of defendant.

¶ 40                                    E. State's Rebuttal

¶ 41      In the State's rebuttal case, the parties stipulated that defendant was previously convicted of misdemeanor theft.

¶ 42                                   F. Closing Arguments

¶ 43      Prior to closing arguments, the State moved to bar the defense from arguing that Cedric had the authority to grant permission to defendant to enter Arkyisha's residence. The State argued that Cedric testified that his name was not on the apartment lease, so he could not "grant permission." The State added that, although Cedric testified that he granted defendant permission to enter the apartment, the statement was "self-serving" and there was "no way to prove that up." Defense counsel, however, argued that the issue of permission to enter the residence was a question of fact for the jury to decide. The trial court found the critical question to be whether Arkyisha revoked defendant's authority in the residence. After reviewing the transcript of Arkyisha's testimony, in which she testified that she had kicked Cedric out of the apartment before meeting Conner, the court granted the State's motion, reasoning that, because Arkyisha had kicked Cedric out, he "had no authority" to give anyone permission to enter the apartment.

¶ 44      In the State's closing argument, it told the jury that the case stemmed from a dispute about a social security disability check. The State highlighted that defendant went to Arkyisha's residence in early April, looking to obtain the check, but was unsuccessful, so she went back on April 14, 2011, with two of her children and an armed Fisher. The State recounted what occurred in the apartment that day, with Conner being shot and defendant's actions afterward, including

asking Rick to take the firearm from her. The State informed the jury of law of accountability and acknowledged that no one truly observed who pulled the trigger on the firearm that ended Conner's life. But the State posited that, regardless of whether defendant or Fisher pulled the trigger, both were "equally responsible." The State pointed out several pieces of evidence that circumstantially showed defendant's guilt and argued that it had proven defendant guilty of first degree murder and home invasion.

¶ 45 In the defense's closing argument, defense counsel posited that the truth about what happened on April 14, 2011, was not an unprovoked rush into Arkyisha's apartment by defendant, but rather an incident provoked by Conner when he punched defendant. During the argument, counsel attempted to cast doubt on Arkyisha's version of events, including the timeline involving Cedric being kicked out of the apartment. Counsel posited that if Cedric had been kicked out of the apartment, it would have been illogical for Arkyisha to have remained the payee on his social security disability check. Counsel noted that Cedric had given defendant keys to the apartment and that, when defendant arrived at the apartment, she heard arguing and knocked on the door. And when Conner opened the door, defendant thought she had authority. "She walked in. She was trying to find out whether [Arkyisha] was okay, and she got hit." According to defense counsel, once defendant was struck by Conner, that caused Fisher "to go somewhat berserk, and events followed." Further, to defense counsel's point about Fisher acting on his own, counsel asserted that, because there was not much blood in the apartment, Conner must have been shot outside the apartment and outside defendant's presence.

¶ 46 G. Verdicts/Posttrial/Sentencing

¶ 47 Following the parties' arguments, the jury returned verdicts finding defendant guilty of home invasion and two different types of first degree murder (hereinafter referred to as Type A

and Type B). Type A was based on the allegation that defendant, or for one she was legally responsible, killed Conner and (i) intended to kill or do great bodily harm to him, (ii) knew that such acts would cause death to him, or (iii) knew that such acts created the strong probability of death or great bodily harm to him. 720 ILCS 5/9-1(a) (West 2010)). Related to Type A first degree murder, the jury was also provided an instruction on second degree murder based on an unreasonable belief of self-defense and a corresponding verdict form. Type B first degree murder was for felony murder and based on the allegation that defendant, or one for whom she was legally responsible, performed the acts that killed Conner and that when she, or one for whom she was legally responsible, did so, she was committing the offense of home invasion. *Id.* §§ 5/9-1(b)(6), 12-11(a)(3).

¶ 48    Defendant unsuccessfully moved for a new trial. After merging the first degree murder convictions together, the trial court sentenced defendant to 30 years' imprisonment on count I and 21 years' imprisonment on both counts of home invasion (counts XXXVII and XXXVIII). The court ordered the sentences for home invasion to run concurrently, while running consecutively to the first degree murder sentence, resulting in defendant being sentenced to a total of 51 years' imprisonment.

¶ 49                                      II. ANALYSIS

¶ 50                              A. Sufficiency of the Evidence

¶ 51    Defendant first contends that the State failed to sufficiently prove her guilty of first degree murder or home invasion, as either the principal of the offenses or under a theory of accountability.

¶ 52    When a defendant challenges the sufficiency of the evidence, the reviewing court must determine if, after viewing the evidence in the light most favorable to the State, any rational trier

of fact could have found the elements of the offense proven beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 35. All reasonable inferences from the evidence must be made in the State's favor. *People v. Hardman*, 2017 IL 121453, ¶ 37. Under this standard of review, it is not the reviewing court's role to retry the defendant. *Gray*, 2017 IL 120958, ¶ 35. And the reviewing court will not substitute its judgment for that of the trier of fact on issues involving the credibility of witnesses, the weight to be afforded to the trial evidence, the drawing of reasonable inferences from the evidence, and the resolution of conflicts within the evidence. *Id.* We will not reverse a conviction "unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Id.*

¶ 53 Under the law of accountability, a person is legally accountable for the conduct of another person when

> "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense. When 2 or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the common design or agreement and all are equally responsible for the consequences of those further acts."

720 ILCS 5/5-2(c) (West 2010). In order to prove that the defendant had the intent to promote or facilitate an offense, the State must prove that (1) there was a common criminal design with the principal offender or (2) the defendant shared the criminal intent of the principal offender. *People v. Fernandez*, 2014 IL 115527, ¶ 13.

¶ 54   In this case, the State proceeded to trial against defendant on five counts, three for first degree murder and two for home invasion. Count I alleged that defendant and Fisher committed first degree murder in that they, without lawful justification, intentionally or knowingly shot and killed Conner while armed with a firearm. Count II alleged that defendant and Fisher committed first degree murder in that they, without lawful justification, shot and killed Conner while armed with a firearm, knowing that such an act created a strong probability of death or great bodily harm to him. Counts 1 and 2 corresponded to the jury's Type A verdict for first degree murder.

¶ 55   Even though the evidence at trial did not point to defendant shooting Conner, to obtain a conviction based on accountability, the State still must prove that a first degree murder occurred (see *People v. Jaimes*, 2014 IL App (2d) 121368, ¶ 38), though the State does not always need to prove who amongst the co-offenders shot the firearm. See *People v. Cooper*, 194 Ill. 2d 419, 435 (2000) (finding "a defendant may be found guilty under an accountability theory even though the identity of the principal is unknown"). Given this, we first must determine whether the State presented sufficient evidence to show that Type A first degree murder occurred. We find there was sufficient evidence to prove a Type A first degree murder occurred, and it was Fisher who shot the firearm that killed Conner.

¶ 56   To prove that Fisher committed Type A first degree murder, the State had to prove that Fisher (1) intended to kill Conner or do great bodily harm to him or knew that such acts would cause his death or (2) knew that his acts created the strong probability of Conner's death or great bodily harm to Conner and (3) was not justified in using the force he used. 720 ILCS 5/9-1(a)(1), (2) (West 2010). "[A] defendant's mental state often needs to be inferred from circumstantial evidence" (*People v. Eubanks*, 2019 IL 123525, ¶ 77), and such inferences are within the province of the jury to make (*People v. Yeoman*, 2016 IL App (3d) 140324, ¶ 19).

¶ 57    When the evidence is viewed in the light most favorable to the State with all reasonable inferences in its favor, the evidence showed that Fisher shot and killed Conner with the intent to kill or do great bodily harm to him, knowing that such acts would cause his death or knowing that such acts created the strong probability of Conner's death or great bodily harm to him. Multiple pieces of evidence showed that Fisher was the triggerman, including Rick's testimony that defendant told him that Fisher shot Conner. Additionally, Jeremiah testified that Fisher must have been the one to shoot the firearm because he had "something" in his hands when they exited the vehicle shortly before the shooting. Moreover, Dr. White testified there was no evidence that Conner had been shot from within two feet or that Conner had been involved in a prolonged fight. This evidence removes any doubt that Fisher was the one who shot Conner, rather than Conner somehow shooting himself or the gun accidentally discharging during a struggle.

¶ 58    All told, there was ample evidence that Fisher shot Conner, and "[t]he intent to murder can be inferred from the act of firing a gun at a person because the natural tendency of such an act is to destroy another's life." *People v. Smith*, 258 Ill. App. 3d 1003, 1027 (1994); see also *People v. Ephraim*, 323 Ill. App. 3d 1097, 1110 (2001) (" 'The very fact of firing a gun at a person supports the conclusion that the person doing so acted with an intent to kill.' " (quoting *People v. Thorns*, 62 Ill. App. 3d 1028, 1031 (1978))). Additionally, there was no evidence that Fisher was lawfully justified in shooting Conner, as nothing in the evidence showed that Conner was armed with any weapon upon answering the front door. Although the trial court gave the jury an instruction on second-degree murder based on the unreasonable belief of the need to defend one's self, the jury clearly rejected any evidence of second degree murder based on the circumstances, and there is no basis to overrule the jury's rejection of second degree murder. See

*People v. Reid*, 179 Ill. 2d 297, 308 (1997) (whether the circumstances justified reducing a first degree murder conviction to second-degree murder "is a question of fact, the determination of which will not be disturbed on appeal if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have reached that determination"). Consequently, the State sufficiently proved that Fisher committed Type A first degree murder of Conner.

¶ 59    Additionally, count XXXVIII alleged that defendant and Fisher committed home invasion by using force or threatening the imminent use of force upon Conner. In order to prove this offense, the State had to show that defendant or one for whom she was legally accountable (1) was not a police officer, (2) knowingly entered the dwelling place of another without authority, (3) knew or had reason to know people were inside the dwelling place, (4) was armed with a firearm, and (5) used, or threatened the imminent use of, force on Conner. 720 ILCS 5/12-11(a)(3) (West 2010) (recodified as 720 ILCS 5/19-6(a)(3)); see Pub. Act 97-1108, § 10-5 (eff. Jan. 1, 2013).

¶ 60    Based on Arkyisha's testimony, after Conner answered the front door and told defendant that she was not there, defendant "bum rushed" the door and entered the apartment. Such conduct by defendant might, on its own, constitute a home invasion with Conner as the victim. See *People v. Ader*, 176 Ill. App. 3d 613, 616 (1988) (finding sufficient evidence of a home invasion based on being armed with a dangerous weapon where the defendant "slash[ed] the screen and kick[ed] in the front door and enter[ed] the foyer with a raised knife clearly threatened those inside the house") But, regardless of defendant's conduct, the evidence sufficiently showed that Fisher committed a home invasion with Conner as the victim. Fisher was obviously not a police officer, and viewing the evidence in the light most favorable to the State, he knowingly entered the dwelling place of another without authority. Afterall, to gain

entry into Arkyisha's apartment, defendant had to force her way inside and Fisher followed. Moreover, based on Arkyisha's own testimony, Cedric, defendant's brother, was kicked out of the apartment months prior to April 2011. There is simply no evidence that Conner or Arkyisha granted defendant or Fisher consent to enter the apartment. See *People v. Witherspoon*, 2019 IL 123092, ¶ 25 (holding "that a defendant enters the dwelling place of another 'without authority' when *** the occupant has not granted consent to enter"). Additionally, there is no question that Fisher knew someone was present inside, based on the conversation that defendant and Conner had. Moreover, based on Jeremiah's testimony, the evidence showed that Fisher was armed with a firearm. And finally, by fighting with Conner and then shooting him, Fisher undoubtedly used force on Conner. Consequently, the State sufficiently proved that Fisher committed home invasion with Conner as the victim.

¶ 61 Assuming *arguendo* that defendant did not commit a home invasion with Conner as the victim based on her own conduct, her guilt for the offense, as well as her guilt for Fisher's Type A first degree murder, could only be sustained under a theory of accountability if (1) she shared the criminal intent of Fisher or (2) she had a common criminal design with Fisher. See *Fernandez*, 2014 IL 115527, ¶ 13.

¶ 62 In this case, when viewing all of the evidence in the light most favorable to the State, there is no evidence to conclude that defendant shared the intent of Fisher to shoot Conner. For instance, in *People v. Graham*, 392 Ill. App. 3d 1001, 1003, 1010 (2009), this court found there was sufficient evidence to convict a defendant of first degree murder based on a shared-intent theory of accountability where he instructed his codefendant to shoot the victim. Conversely, in *People v. Taylor*, 186 Ill. 2d 439, 449 (1999), our supreme court found there was insufficient evidence to convict a defendant of aggravated discharge of a firearm based on a shared-intent

theory of accountability. In that case, the defendant, who was driving a vehicle, was involved in a traffic altercation wherein his vehicle and another vehicle were attempting to pass each other on a narrow road. *Id.* at 442-43. The defendant stopped his vehicle, and when he did, his passenger exited the car and fired a gun at the other vehicle. *Id.* at 443-44. The pair then drove off together. *Id.* at 444. In reversing the appellate court, which had affirmed the defendant's conviction, our supreme court acknowledged that the defendant and his passenger left the scene together, but concluded there was no evidence presented at trial that the defendant had knowledge that his passenger was going to fire a gun or that he aided his passenger in firing the gun. *Id.* at 448-49. Stated another way, because the passenger spontaneously decided to discharge his firearm and there was no common criminal design between him and the defendant, the defendant could not be convicted under a theory of accountability where the evidence was insufficient to show that the defendant shared the criminal intent of his passenger. Turning back to the instant case, looking only at the shared-intent theory of accountability, the State presented no evidence to show that defendant shared the intent of Fisher to shoot Conner. As such, defendant cannot be held accountable for Conner's murder based on the shared-intent theory of accountability.

¶ 63    But, as mentioned, the shared-intent theory of accountability is one of two distinct manners in which a person can be held accountable for another's actions. See *Fernandez*, 2014 IL 115527, ¶ 13. Unlike the shared-intent theory of accountability, under the common-criminal-design theory of accountability, the State does not need to prove that the defendant and the principal shared the same intent concerning the charged crime. *People v. Phillips*, 2014 IL App (4th) 120695, ¶ 43. Rather, the State only needs to prove that the defendant " 'had the specific intent to promote or facilitate *a* crime.' " (Emphasis in original.) *Id.* (quoting *People v. Houston*,

258 Ill. App. 3d 364, 369 (1994)). Under the common-criminal-design rule, if " 'two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts.' " *Fernandez*, 2014 IL 115527, ¶ 13 (quoting *In re W.C.*, 167 Ill. 2d 307, 337 (1995)). As our supreme court said long ago, "[w]here murder is committed during a robbery, all participants in the robbery are deemed equally guilty of murder and it is immaterial who fired the fatal shot." (Internal quotation marks omitted.) *People v. Johnson*, 55 Ill. 2d 62, 67 (1973). "It is the fact that the defendant and a co-offender had a common criminal design to begin with that makes [her] responsible for any act in furtherance of that criminal design." *People v. Wilson*, 2020 IL App (1st) 162430, ¶ 67 (citing 720 ILCS 5/5-2(c) (West 2012)).

¶ 64    In *Fernandez*, 2014 IL 115527, ¶ 14, our supreme court observed that a "textbook application" of the common-criminal-design rule occurred in *People v. Kessler*, 57 Ill. 2d 493 (1974). In that case, the defendant and two co-offenders planned to burglarize a closed tavern. *Id.* 494-95. The two co-offenders went inside, while the defendant stayed in the car. *Id.* at 494. The co-offenders were surprised when the tavern's owner was present, and one of them shot the owner with a gun he found at the tavern. *Id.* at 495. The co-offenders ran back to the vehicle, and they sped away from the scene. *Id.* Soon after, the police began chasing them and one of the co-offenders drove the car into a ditch and fled on foot along with the other co-offender. *Id.* The defendant, meanwhile, stayed in the car. *Id.* As the co-offenders were running away, one of them shot at a police officer. *Id.* The defendant was arrested and eventually found guilty of burglary as well as attempted murder of both the tavern owner and the police officer. *Id.*

¶ 65 The defendant appealed, and the appellate court framed the critical issue as whether he could " 'be found guilty on accountability principles without proof of his specific intent to commit the attempt murders perpetrated by [his companions].' " *Id.* (quoting *People v. Kessler*, 11 Ill. App. 3d 321, 325 (1973)). After reviewing the accountability statute, the appellate court held that

> " 'except in felony-murder cases, the [Criminal Code of 1961 (Ill. Rev. Stat. 1971, ch. 38,
> ¶ 5-2)] does not impose liability on accountability principles for all consequences and
> further crimes which could flow from participation in the initial criminal venture, absent
> a specific intent by the accomplice being held accountable to commit, or aid and abet the
> commission of, such further crimes.' " *Id.* at 495-96 (quoting *Kessler*, 11 Ill. App. 3d at
> 325-26).

As such, the appellate court reversed the defendant's convictions for attempted murder. *Id.* at 495.

¶ 66 Our supreme court disagreed and found the convictions for attempted murder were proper, remarking that

> "the burglary was the offense which [the defendant and his companions] had
> jointly planned and were jointly committing, and each was legally accountable for
> the conduct of the other in connection therewith. The result was the offense of
> attempted murder of [the tavern owner] and of [the police officer] who answered
> a report of the incident and who tried to apprehend the fleeing parties." *Id.* at 499.

In *Fernandez*, 2014 IL 115527, ¶ 16, our supreme court highlighted the holding of *Kessler* and noted, "[i]n other words, once [the defendant in *Kessler*] agreed to participate in burglary, he was liable under [the accountability statute] for every criminal act committed 'in connection

therewith,' including the unplanned shootings committed by his initially unarmed companions." As such, under the common-criminal-design rule, as discussed in *Fernandez* and *Kessler*, a "defendant cannot escape liability merely because his criminal intentions did not rise to the level of murder." *Phillips*, 2014 IL App (4th) 120695, ¶ 34.

¶ 67     In order to demonstrate accountability, the State need not present evidence of a verbal agreement between co-offenders (*People v. Perez*, 189 Ill. 2d 254, 267 (2000)), nor show that the defendant directly participated in the perpetration of the criminal act (*In re W.C.*, 167 Ill. 2d at 338). In determining whether a common criminal design existed, the trier of fact may consider the defendant's presence during the commission of the crime, her continued close affiliation with any co-offenders afterward, her failure to report the crime, and her flight from the scene. *People v. Batchelor*, 171 Ill. 2d 367, 376 (1996). But the defendant's mere presence at the scene of the crime, even coupled with knowledge that a crime is being committed, is insufficient to establish accountability. *In re W.C.*, 167 Ill. 2d at 338.

¶ 68     The evidence in the State's case showed that defendant and Fisher had a common criminal design to obtain Cedric's social security disability check, which designated Arkyisha as the payee, from Arkyisha by whatever means necessary. The motive for the encounter was clear. A week or so prior, defendant went to Arkyisha's apartment and inquired about the check. When Arkyisha informed defendant that she did not have the check, their conversation began to escalate, prompting Arkyisha to tell defendant to leave. Clearly, after this conversation, tensions between Arkyisha and defendant were simmering, all in connection with Cedric's social security disability check. These tensions set the stage for April 14, 2011, where defendant returned to Arkyisha's apartment, not alone, but rather with two of her children and, most importantly, an

armed Fisher. Although there is no direct evidence showing that defendant knew Fisher was armed, that is immaterial.

¶ 69    In *Fernandez*, 2014 IL 115527, ¶¶ 12, 19, 23, our supreme court affirmed a defendant's conviction for aggravated discharge of a firearm at a police officer and, in doing so, expressly rejected an argument from the defendant that his conviction had to be reversed because "the State failed to produce any evidence showing that defendant even knew [his co-offender] had a gun, let alone that he knew that [his co-offender] would discharge that gun in the direction of a police officer." The court asserted that such an argument was "utterly precluded" by *Kessler* and its progeny. *Id.* ¶ 19.

¶ 70    Regardless of whether defendant knew Fisher was armed, the circumstances show that she brought him there to be her enforcer to ensure that she obtained Cedric's check no matter what. See *People v. Walker*, 262 Ill. App. 3d 796, 800 (1994) (evidence supported the defendant's engagement in a common criminal design that led to a murder where he "instigated the events which led to the victim's death, as he sought to retaliate for his brother's beating" and brought along another person whom he knew was the chief enforcer of his gang). First, both defendant and Fisher arrived at the scene together, and defendant was present when Fisher murdered Conner. See *People v. Doolan*, 2016 IL App (1st) 141780, ¶ 46 (sufficient evidence to convict the defendant of first degree murder under a theory of accountability where, in part, "he was with members of his gang" before the offenses); *People v. Williams*, 262 Ill. App. 3d 734, 741-42 (1994) (sufficient evidence to convict the defendant of first degree murder where, in part, he drove his co-offender to the scene of the crime).

¶ 71    Additionally, a gunshot going off in Arkyisha's apartment did not even deter defendant, as after it, she kicked open a bedroom door where Arkyisha and her children were located.

According to Arkyisha, once defendant entered, she became "berserk," grabbed the cell phone in Arkyisha's hands, slammed it to the ground, and yelled about the social security disability check. Defendant even told Jeremiah to get her firearm because she was "fitting to kill" Arkyisha. Even Jeremiah testified to defendant appearing upset and telling Arkyisha that she had to cash the check. After threatening Arkyisha, defendant left the apartment and walked past Connor's body outside without helping him. Defendant then fled from the scene and never reported what had happened to the police. See *Batchelor*, 171 Ill. 2d at 376 (evidence that the defendant fled from the scene of the crime and never reported the crime are facts the trier of fact may consider in determining whether accountability exists). In fact, defendant tried to get rid of a firearm, likely the very weapon Fisher used to kill Conner, by asking Rick to take the weapon. See *Fernandez*, 2014 IL 115527, ¶ 17 (finding that, in the hours after a shooting, the "defendant not only failed to report the shooting but also took several steps to conceal it" which were "relevant to the determination of whether a common criminal design exists"). Furthermore, defendant and Fisher maintained a close affiliation with one another after Conner's murder. After leaving Rick's apartment shortly after Fisher had shot Conner, defendant told Rick that she was going to pick up Fisher. And approximately a month after the shooting, defendant and Fisher were arrested together. See *People v. Johnson*, 260 Ill. App. 3d 558, 565 (1994) (finding evidence of a common criminal design where the defendant "did not disassociate himself from [his co-offender] after the crime" as "both defendants were arrested together two days after the murder").

¶ 72    All told, defendant's actions leading up to the afternoon of April 14, 2011, her actions in the afternoon of April 14, 2011, and her actions following the afternoon of April 14, 2011, show that when defendant arrived at Arkyisha's apartment with Fisher, there was a common criminal

design to take the social security disability check no matter the method, and defendant subjected herself to culpability for any acts undertaken by Fisher in furtherance of that criminal design. Although the original intent of defendant may have been to simply steal the check, with Fisher being just the "muscle," and, thus, her original criminal intent may have been to commit simple robbery, burglary or theft, it is not a defense that the ultimate criminal acts were not planned. See *In re W.C.*, 167 Ill. 2d at 338. Rather, when defendant brought Fisher with to ensure that she obtained the check, she became responsible for any act of his in furtherance of that criminal design (see *Fernandez*, 2014 IL 115527, ¶ 13), including the home invasion in which Conner was the victim and his subsequent murder, regardless of whether she shared Fisher's intent. Because the evidence showed a common criminal design between defendant and Fisher, the State sufficiently proved defendant guilty of Type A first degree murder (counts I and II) and home invasion with Conner as the victim (count XXXVIII).

¶ 73    Although the jury also found defendant guilty of Type B first degree murder (count IV), which was felony murder based on the commission of a home invasion, we need not discuss this conviction because "[a] defendant cannot be convicted of more than one murder arising out of the same physical act." *People v. Pitsonbarger*, 142 Ill. 2d 353, 377 (1990). The jury found defendant guilty of both Type A first degree murder (counts I and II) and Type B first degree murder (count IV), but only a conviction on the most serious type of murder can stand. See *id.* at 377-78. As count I alleged an intentional murder of Conner, it was the most serious offense (*id.* at 378); accordingly, the trial court merged counts II and IV into count I and sentenced defendant on only count I. Because there was sufficient evidence to convict defendant of Type A first degree murder, which included count I, a discussion of felony murder is unnecessary.

¶ 74 The only count not discussed is count XXXVII, which alleged that defendant and Fisher committed home invasion when they, without authority and while armed with a firearm, (1) knowingly entered Arkyisha's residence, (2) knew or had reason to know one or more people were present, and (3) used force or threatened the imminent use of force upon Arkyisha. There was sufficient evidence to prove that defendant on her own committed this offense.[3] In order to prove this offense, the State had to show that defendant or one for whom she was legally accountable (1) was not a police officer, (2) knowingly entered the dwelling place of another without authority, (3) knew or had reason to know people were inside the dwelling place, (4) was armed with a firearm, and (5) used, or threatened the imminent use of, force on Arkyisha. 720 ILCS 5/12-11(a)(3) (West 2010).

¶ 75 Here, defendant was clearly not a police officer. When the evidence is viewed in the light most favorable to the State, as noted with Fisher's home invasion with Conner as the victim, it showed that she knowingly entered Arkyisha's residence without authority. As defendant spoke to Conner at the front door, she clearly knew at least he was present. Both Arkyisha and Jeremiah testified that defendant told Conner that she heard Arkyisha inside. Furthermore, as already discussed, the evidence showed that Fisher, for whom defendant was responsible, was armed with a firearm. See *People v. Baugh*, 358 Ill. App. 3d 718, 728-30 (2005) (finding the defendant was guilty of home invasion while being armed with a firearm where, although he did not possess a firearm, his co-offenders did and he was accountable for their actions). Lastly, there was ample evidence that defendant threatened the imminent use of force on Arkyisha. For

_____

[3]We note that the State proceeded to trial against defendant on count XXXVII. During sentencing, the trial court expressly remarked that she had been convicted on count XXXVII and proceeded to sentence her to 21 years' imprisonment on this count. However, the jury instructions mentioned only Conner as a victim, and there was only one set of verdict forms concerning home invasion.

one, defendant forced her way inside the apartment, which caused Arkyisha to call the police. See *People v. Kovacs*, 135 Ill. App. 3d 448, 450-51 (1985) (finding that, in order to satisfy the home invasion statute's use of force or threatening the imminent use of force requirement, no "fine distinction" needs to be made between conduct outside and inside the dwelling place). And a home invasion victim does not need to wait inside her dwelling place to ascertain the intentions of a home invader. See *People v. Kolls*, 179 Ill. App. 3d 652, 655 (1989) (observing that to allow a defendant to evade a conviction for home invasion where the victim flees or is forced from his dwelling place before any entry would defeat the purpose of the statute). That is to say, defendant's actions of forcing her way into Arkyisha's apartment alone possibly could have satisfied the requisite threat of the imminent use of force, especially given that she and Arkyisha had a heated conversation early that month about the social security disability check. In any event, after the gunshot rang out in the apartment, defendant kicked open a bedroom door, found Arkyisha, grabbed the cell phone in Arkyisha's hand, and slammed it to the ground. Defendant then threatened Arkyisha with a firearm when she asked Jeremiah to get the weapon because defendant was "fitting to kill" Arkyisha and told Arkyisha she would be back. The evidence therefore sufficiently showed that defendant committed a home invasion as charged in count XXXVII, and there was sufficient evidence to convict her of all of the offenses.

¶ 76                                    B. Admission of Defendant's Prior Conviction

¶ 77    Defendant next contends that the trial court erred in allowing the State to use her prior misdemeanor theft conviction for impeachment purposes and that the State inappropriately impeached her with the conviction on cross-examination. We begin with the threshold question of whether defendant's prior misdemeanor theft conviction was admissible as impeaching evidence.

¶ 78   Under Illinois Rule of Evidence 609(a) (eff. Jan. 1, 2011), which governs the impeachment of a witness with a prior criminal conviction:

> "[E]vidence that the witness has been convicted of a crime, except on a plea of *nolo contendere*, is admissible but only if the crime, (1) was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, or (2) involved dishonesty or false statement regardless of the punishment unless (3), in either case, the court determines that the probative value of the evidence of the crime is substantially outweighed by the danger of unfair prejudice."

In other words, regardless of whether the conviction is admissible under subsection (a)(1) or (a)(2), the trial court still needs to conduct a balancing test to determine whether it is ultimately admissible. *People v. Mullins*, 242 Ill. 2d 1, 14 (2011). Further, "[e]vidence of a conviction under this rule is not admissible if a period of more than 10 years has elapsed since the date of conviction or of the release of the witness from confinement, whichever is the later date." Ill. R. Evid. 609(b) (eff. Jan. 1, 2011). The 10-year limit is based upon actual confinement in prison and does not include a period of probation. *People v. Warmack*, 83 Ill. 2d 112, 124 (1980).

¶ 79   In conducting the requisite balancing test, the trial court should consider such factors as the nature of the previous conviction, how much time has elapsed since that conviction, the life the defendant has lived since the conviction, the defendant's criminal record, and the similarity between the prior conviction and the charged offense. *Mullins*, 242 Ill. 2d at 14-15. After conducting this balancing test, if the court concludes that the prejudice from allowing the State to impeach the defendant with the prior conviction substantially outweighs its probative value, the court must bar the State from using the conviction. *Id.* at 15. The court has discretion in deciding

whether to allow the State to use a prior conviction for impeachment purposes (*id.*), and it will abuse that discretion only where its ruling is arbitrary or fanciful or where no reasonable person would agree with the court (*People v. Patrick*, 233 Ill. 2d 62, 68 (2009)).

¶ 80    Initially, we observe that misdemeanor theft is a crime of dishonesty (see *People v. Spates*, 77 Ill. 2d 193, 202-03 (1979)), and the purpose of allowing the State to impeach the defendant with a prior conviction is to "bear upon the defendant's truthfulness as a witness." *People v. Williams*, 161 Ill. 2d 1, 39 (1994)). We also note that defendant was sentenced to probation for her previous misdemeanor theft conviction on January 15, 2004, and her jury trial began on January 10, 2014. Nevertheless, her conviction was still within the 10-year time period established by Rule 609(b). See *People v. Naylor*, 229 Ill. 2d 584, 602 (2008) (holding that the "10-year time limit should be calculated in relation to the date of the defendant's trial"). But, certainly, the length of time since her conviction and the fact that she had no convictions since then weighs against its admissibility. See *Mullins*, 242 Ill. 2d at 15. Defendant posits that another factor weighs against her conviction's admissibility. She argues that the State's theory of the case was that greed motivated her desire to obtain her brother's social security disability check, and greed is similar in nature to theft. However, while the similarity between the prior conviction and the charged offense is a factor that weighs against the admissibility of a prior conviction (see *id.* at 14-15), defendant cites no case showing that, because what underlies the charged offenses is similar to a prior conviction, the prior conviction should be deemed inadmissible. In the present case, the jury was evaluating whether defendant was guilty of first degree murder and home invasion—crimes of violence—rather than theft—a crime of dishonesty. See *People v. Woodard*, 276 Ill. App. 3d 242, 245 (1995) (rejecting a defendant's attempt to liken his charged offense of aggravated battery to his prior conviction for theft where stealing gasoline led to his

aggravated battery charge because "[t]here is no similarity between theft and aggravated battery" as "[o]ne is a crime involving dishonesty; the other is a crime involving violence").

¶ 81    The probative value of allowing the jury to consider defendant's prior crime of dishonesty where her credibility was integral to the jury's resolution of the case was strong. See *Williams*, 161 Ill. 2d at 39 (the purpose of impeaching a witness with a prior conviction is to bear on "the defendant's truthfulness as a witness"). And although the length of time between the charged offenses and the prior conviction, as well as defendant's life after her prior conviction, weighed in favor of defendant's prior conviction being deemed inadmissible, the court did not unreasonably find that those factors failed to result in the probative value of the evidence being substantially outweighed by the danger of unfair prejudice. Consequently, the trial court did not abuse its discretion in allowing the State to use defendant's prior conviction for impeachment purposes.

¶ 82    We now turn to defendant's second argument—that the State inappropriately impeached her with the conviction on cross-examination rather than introducing evidence of the conviction during its rebuttal case. It is well-established that, "[w]hen the defendant testifies in a criminal case, the State may not impeach the defendant's testimony by cross-examination as to his or her prior conviction, but rather only by introducing the record of the prior conviction." *Naylor*, 229 Ill. 2d at 594; see also *People v. Long*, 2018 IL App (4th) 150919, ¶¶ 90-91 (same). Given this established principle of law, the State concedes that, during its cross-examination of defendant, it improperly asked her about her previous conviction for theft rather than introducing the record of her prior conviction during its rebuttal case. However, the State argues that its error was harmless.

¶ 83    When the State improperly impeaches the defendant during cross-examination with a prior conviction, "reversal is not required unless the error has deprived defendant of substantial justice or influenced the determination of his guilt." *People v. Madison*, 56 Ill. 2d 476, 488 (1974). Instructive is *People v. Smith*, 241 Ill. App. 3d 365, 369 (1992), where a defendant was on trial for murder and home invasion. During the State's cross-examination of the defendant, it asked him whether he had been convicted of crimes in four previous cases, and he acknowledged the convictions. *Id.* at 373. The State followed up and asked whether he had once told the police that he wore socks over his hands to conceal his fingerprints. *Id.* Defendant acknowledged the remark but testified that he was joking with the police. *Id.* Although the appellate court found the State's manner of impeachment improper, it found the error to be harmless. *Id.* at 381. The court observed that there was sufficient evidence to convict the defendant of the offenses. "The jury would in any event have learned of defendant's prior convictions, a proper impeachment tactic," and "[t]he prosecutor did not belabor the point, asking defendant if he, in fact, had been convicted of four previous felonies." *Id.*

¶ 84    In the instant case, just like in *Smith*, there was sufficient evidence of defendant's guilt for the offenses, and the jury would have eventually learned about her prior theft conviction during the State's rebuttal case. However, in this case, unlike in *Smith*, the State asked only one question to defendant regarding the previous conviction, which she did not even answer because her trial counsel objected. Additionally, the trial court instructed the jury to disregard the State's question. Because *Smith* found the State's improper manner of impeachment to be harmless, and the circumstances in this case were far less prejudicial than what occurred in *Smith*, we find the State's error did not deprive defendant of substantial justice or influence the determination of her guilt. Consequently, the State's error was harmless and did not constitute reversible error.

¶ 85                                   C. Marital Privilege

¶ 86    Defendant next contends that Rick McKnight was improperly allowed to testify about two statements she made to him regarding the shooting of Conner. The first statement was when defendant told Rick that "Marvel shot him," and the second statement was when she told Rick that she would take responsibility for the shooting because she had previously tried to commit suicide and the police may be more lenient on her as a result.

¶ 87    Section 115-16 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-16 (West 2010)) contains Illinois's marital privilege law. According to the privilege, "husband and wife may testify for or against each other" but neither "may testify as to any communication or admission made by either of them to the other or as to any conversation between them during marriage, except in cases in which either is charged with an offense against the person or property of the other." *Id.* The privilege is "intended to further marital harmony, mutual understanding and trust by encouraging full disclosure, free communication, and confidential communications between spouses." *People v. Trzeciak*, 2013 IL 114491, ¶ 41. The privilege applies even if the parties are separated, so long as they are not divorced. *People v. Dubanowski*, 75 Ill. App. 3d 809, 811 (1979).

¶ 88    However, the privilege does not protect all communications but, rather, only "communications which are intended to be confidential." *Trzeciak*, 2013 IL 114491, ¶ 42. There is a presumption that a privately made communication between a husband and wife is intended to be confidential. *Id.* But "where it appears from the nature or circumstances under which the communication was made that confidentiality was not intended, the communication is not privileged." *Id.* Whether a communication is protected by the marital privilege depends on the circumstances surrounding the communication, and such a determination is a question of fact

that the trial court generally must resolve. *Id.* ¶ 51. To assert the privilege, the defendant must invoke it, and her failure to do so "waive[s]" the application of the privilege. *People v. Hall*, 194 Ill. 2d 305, 334-35 (2000).

¶ 89 Defendant concedes that her trial counsel did not invoke the marital privilege during Rick's testimony, and thus, she has not preserved her challenge to the admissibility of the statements. Defendant argues, however, that we may review the comments under the plain error doctrine. Under the plain error doctrine, we may review an unpreserved claim of error if there was a clear or obvious error and either (1) the evidence was so closely balanced that the error, by itself, threatened to tip the scales of justice against the defendant, regardless of the gravity of the error, or (2) the error was so serious that it resulted in an unfair trial to the defendant and challenged the integrity of the judicial process, regardless of how close the evidence was at trial. *Id.* at 335. The defendant has the burden to show plain error occurred (*People v. Thompson*, 238 Ill. 2d 598, 613 (2010)), and the first step under the doctrine is to determine whether there was a clear or obvious error (*People v. Sebby*, 2017 IL 119445, ¶ 49).

¶ 90 Initially, we note that, although the evidence at trial showed that defendant and Rick were estranged when defendant made the statements to Rick, the evidence still showed that they were legally married to one another. As such, the privilege would still protect their communications if they were intended to be confidential. See *Dubanowski*, 75 Ill. App. 3d at 811. We begin with the first statement at issue where defendant told Rick that "Marvel shot him," *i.e.*, Conner. According to Rick's testimony, around 4:00 or 4:30 p.m. on April 14, 2011, defendant called and told him that she was bringing Jeremiah and Brandon home early and that "Marvel shot him." About 5 to 10 minutes after this conversation, Rick went downstairs and observed defendant, Brandon, and Jeremiah in a vehicle driven by Ricky. Furthermore, according to Jeremiah's

testimony, after leaving Arkyisha's apartment, he, defendant, Brandon, and Ricky drove to Rick's apartment. As such, the evidence showed that when defendant made this statement to Rick, she did so while in the presence of Jeremiah, who the evidence revealed to be with defendant from the time she entered the apartment to the time she met Rick afterward, and very likely Ricky and Brandon, based on the circumstances.

¶ 91 "[C]ommunications made in the presence of a third person are generally not considered to be confidential." *People v. Layne*, 286 Ill. App. 3d 981, 990 (1997). Specific to third persons being children, our supreme court has expressly denied expanding the marital privilege to protect instances where spouses make statements in the presence of their children "unless they are too young to understand what is being said." *People v. Sanders*, 99 Ill. 2d 262, 268-69 (1983). In that case, our supreme court found that the presence of the 13-year-old child of a married couple "rendered the conversation ineligible for the protection of the statutory [marital] privilege." *Id.* at 269. Here, Jeremiah was 10 years old in April 2011, and Brandon, based on his age at trial, was around 12 years old. Thus, they were old enough to understand what was being said. Furthermore, Ricky was driving the family's vehicle to Rick's apartment. Although the record does not reveal his age, he certainly had the requisite understanding if he was driving a car. Consequently, defendant's statement to Rick that "Marvel shot him" was not protected by the marital privilege.

¶ 92 The second statement at issue was when defendant told Rick that she would take responsibility for the shooting because she had previously tried to commit suicide and the police may be more lenient on her as a result. The circumstances of this statement are less clear than the first one, but according to Rick, it occurred some three or four hours after their afternoon telephone conversation. Although there is no evidence that anyone was with either defendant or

Rick when she made the statement, defendant did not make such a statement to only Rick. At trial, during the cross-examination of Jeremiah, he acknowledged that defendant told him to tell the police that she was the shooter, which in part was so "she [could] protect [Fisher]." Moreover, as the State observes, during defendant's own cross-examination, she testified that she told her sister that she was going to turn herself in and take responsibility to protect Fisher. Although it does not appear that defendant told anyone else about the suicide aspect, the incriminating part of the conversation with Rick was that she was going to take responsibility for the shooting to protect Fisher. Given that defendant told her sister and Jeremiah that she was going to take responsibility for the shooting to protect Fisher, defendant could not have intended her conversation relaying a strikingly similar statement to Rick to be made in confidence, as the marital privilege requires. See *Trzeciak*, 2013 IL 114491, ¶ 52. Consequently, this statement was not protected by the marital privilege.

¶ 93    Because both of defendant's statements to Rick were not protected by the marital privilege, defendant has failed to carry her burden to show that a clear or obvious error occurred and, therefore, has failed to show plain error. See *Sebby*, 2017 IL 119445, ¶ 49. Defendant alternatively argues that her trial counsel was ineffective for not objecting to the admission of Rick's testimony on the basis of the marital privilege, which would have resulted in her preserving her claim of error. But because there was no clear or obvious error, there cannot be ineffective assistance of counsel. See *People v. Hensley*, 2014 IL App (1st) 120802, ¶ 47.

¶ 94                                D. Autopsy Photographs

¶ 95    Defendant next contends that the trial court erred when it allowed the State to publish three autopsy photographs of Conner—People's Exhibit Nos. 63, 64, and 65—during the testimony of Dr. White, an assistant medical examiner at the Cook County Medical Examiner's

Office. People's Exhibit No. 63 depicted Conner's right lung, part of his liver, and some visible blood; People's Exhibit No. 64 again depicted Conner's right lung, part of his liver, and some visible blood; and People's Exhibit No. 65 was a close-up of Conner's heart. In allowing the State to publish these photographs over the defense's objection, the court determined that they were "not incredibly gruesome, they're just of the human body and the organs contained therein and close-ups of those organs." According to defendant, the photographs were gruesome and graphic, and because Conner's death was not in question, the photographs had little probative value. As such, defendant posits that the photographs served only to inflame the passions of the jury.

¶ 96    The trial court has broad discretion in determining whether to allow a party to publish photographs, including autopsy photographs, at trial. *People v. Brown*, 172 Ill. 2d 1, 40-41 (1996); *People v. Tatum*, 2019 IL App (1st) 162403, ¶ 110. Given this discretion, the court's ruling may not be reversed unless it has abused its discretion. *Brown*, 172 Ill. 2d at 40-41. As previously noted, an abuse of discretion occurs when the court's ruling is arbitrary, fanciful, or where no reasonable person would agree with the court. *Patrick*, 233 Ill. 2d at 68.

¶ 97    The admissibility of evidence always begins with the inquiry of whether that evidence is relevant. Ill. Rs. Evid. 401, 402 (eff. Jan. 1, 2011). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). Autopsy photographs may be relevant for a myriad of reasons, including "to prove the nature and extent of the injuries, the position, condition, and location of the body, and the manner and cause of death; to corroborate a defendant's confession; and to aid in understanding the testimony of a pathologist or other witness." *People v. Chapman*, 194 Ill. 2d 186, 220 (2000).

Even where the precise cause of death is not in question at trial, the State may admit autopsy photographs. See *People v. Bounds*, 171 Ill. 2d 1, 46-47 (1995) (holding that autopsy photographs of a murder victim were properly admitted and published to the jury despite the cause of death being undisputed). If autopsy photographs are relevant, they are admissible unless their "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 98    In this case, the photographs were relevant because they assisted the jury in understanding Dr. White's testimony about the autopsy performed on Conner, but more importantly provided evidence of Conner's injuries. The photographs were not shown to the jury to inflame their passions, but rather to show evidence of Conner's internal bleeding. As noted by the State, part of the defense's theory of the case was that the shooting of Conner did not take place in Arkyisha's apartment, but rather outside the apartment and outside the presence of defendant. And to support this theory, defense counsel made remarks about the lack of blood inside Arkyisha's apartment.

¶ 99    But Dr. White testified that Conner died as a result of a single gunshot that entered his right arm which then pierced part of his right lung and heart. Given the trajectory of the bullet through Conner's body, Dr. White further testified that Conner's chest began filling up with blood, he could have remained conscious for up to two minutes after being shot, and it was not surprising that there was little externally visible blood. Because People's Exhibit Nos. 63, 64, and 65 were evidence of those internal injuries and internal bleeding, the photographs assisted the jury in understanding Dr. White's testimony and helped refute part of the defense's theory. Given their probative value in these manners, despite the photographs undoubtedly being

somewhat graphic, we cannot say the trial court abused its discretion in allowing the State to publish the photographs during Dr. White's testimony. See *People v. Himber*, 2020 IL App (1st) 162182, ¶ 45 (finding the trial court properly allowed autopsy photographs to be shown to the jury where they were "used by the State to rebut the defense theory" about the circumstances surrounding a shooting); *Tatum*, 2019 IL App (1st) 162403, ¶¶ 118-121 (finding the trial court properly allowed autopsy photographs to be shown to the jury where they were relevant to the parties' theories of the case during closing argument).

¶ 100   Nevertheless, defendant points to *People v. Lefler*, 38 Ill. 2d 216 (1967) and *People v. Landry*, 54 Ill. App. 3d 159 (1977), as support for her proposition that the trial court abused its discretion. In *Lefler*, 38 Ill. 2d at 222, our supreme court concluded that the trial court abused its discretion in allowing the jury to view autopsy photographs, finding "that the pictures had little probative value in view of the detailed testimony by the physician and the fact that the nature and extent of the injuries was not disputed." In *Landry*, 54 Ill. App. 3d at 162, the appellate court concluded that the trial court abused its discretion in allowing the jury to view autopsy photographs finding the prejudice from their admission outweighed the probative value where the nature and circumstances of the victim's death was not truly in question. But, in contrast to *Lefler* and *Landry*, the nature and circumstances of Conner's death were in dispute, in particular where and when it occurred during the sequence of events on April 14, 2011. As such, the instant case is unlike *Lefler* and *Landry*, and the trial court did not err in allowing the State to publish People's Exhibit Nos. 63, 64, and 65 to the jury.

¶ 101                    E. Restricting the Defense's Closing Argument

¶ 102   Defendant next contends that the trial court erred when it forbade her trial counsel, during closing argument, from arguing about whether she had the authority to enter Arkyisha's apartment.

¶ 103   As previously discussed, prior to closing argument, the State moved to bar the defense from arguing that Cedric had the right to grant permission to defendant to enter Arkyisha's residence because, under the circumstances, he had no legal authority to grant permission to anyone to enter the apartment. The trial court found the critical issue of authority to be whether Arkyisha revoked defendant's authority in the residence. After reviewing the transcript of Arkyisha's testimony, in which she testified that she had kicked Cedric out of the apartment before meeting Conner, the court granted the State's motion. It reasoned that, because Arkyisha had kicked Cedric out, he "had no authority" to give anyone permission to enter the apartment. According to defendant, when the court ruled in this manner and restricted her closing argument, it prevented her from arguing about an element of the offense of home invasion, in particular the gravamen of the offense: unauthorized entry. And in doing so, defendant posits that the court's restriction of her closing argument was manifestly unreasonable.

¶ 104   Closing arguments are derived from a defendant's sixth amendment right to the assistance of counsel (*People v. Stevens*, 338 Ill. App. 3d 806, 810 (2003)), and "[t]here can be no doubt that closing argument for the defense is a basic element of the adversary factfinding process in a criminal trial." *Herring v. New York*, 422 U.S. 853, 858 (1975). In fact, closing arguments are one of only two instances where a lawyer can speak directly to the jurors and discuss the evidence from trial. *People v. Ramos*, 2018 IL App (1st) 151888, ¶ 31. "And for the

defense, closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt." *Herring*, 422 U.S. at 862.

¶ 105    Though closing argument is essential for the defense, the trial court retains great latitude in limiting the scope of that argument. *People v. Burnett*, 237 Ill. 2d 381, 389 (2010). However, any limits placed on closing argument must be reasonable. *Ramos*, 2018 IL App (1st) 151888, ¶ 27. The trial court may " 'limit counsel to a reasonable time and may terminate argument when continuation would be repetitive or redundant,' " and it may take steps to " 'ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial.' " *Id.* ¶ 32 (quoting *Herring*, 422 U.S. at 862). We review the court's limit of the defense's closing argument for an abuse of discretion. *People v. Harris*, 132 Ill. 2d 366, 391 (1989).

¶ 106    As noted, "[a] person who is not a peace officer acting in the line of duty commits home invasion when without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present." 720 ILCS 5/12-11(a)(3) (West 2010). Recently, in *Witherspoon*, 2019 IL 123092, ¶ 1, our supreme court analyzed the "without authority" element of the home invasion statute. In doing so, the court "conclude[d] that the 'without authority' element must include the mental state of knowledge." *Id.* ¶ 31. In other words, the home invasion statute is not an absolute liability offense. *Id.* ¶¶ 30-31. And, thus, it is not enough that the defendant enters a dwelling place of another without authority, but rather, the State must prove that the defendant knew she entered the dwelling place of another without authority. *Id.* ¶ 31.

¶ 107    In the instant case, despite the trial court precluding defense counsel from arguing that defendant had the legal authority to enter Arkyisha's apartment because of Cedric's permission, counsel made various arguments related to whether defendant knew she entered the dwelling

place of another without authority. For one, counsel posited that it was illogical that Arkyisha would have remained the payee on Cedric's social security disability check if he had truly been kicked out of the apartment. Counsel also noted defendant's testimony that Cedric had given her keys to Arkyisha's apartment, but noted that, when defendant arrived, she heard an argument occurring inside. To this end, counsel argued that, when Conner answered the door, defendant "thought she had authority. She walked in. She was trying to find out whether [Arkyisha] was okay, and she got hit." That is to say, despite the court ruling that limited the defense's closing argument, defense counsel was still able to address the circumstances surrounding defendant's entry into the apartment and whether she *knew* she lacked the authority. Because of this, regardless of whether the court properly exercised its discretion in limiting the defense's closing argument, we find any alleged error harmless. See *Hall*, 194 Ill. 2d at 350 (errors related to closing arguments subject to harmless-error analysis); *People v. Kliner*, 185 Ill. 2d 81, 135 (1998) (errors in limiting the defense in making its case subject to harmless-error analysis).

¶ 108                                    F. Cumulative Error

¶ 109   Defendant lastly contends that the cumulative effect of the errors at her trial demonstrated a pervasive pattern of unfair prejudice such that, even if the errors individually did not rise to the level of reversible error, the errors cumulatively did in light of the closeness of the evidence.

¶ 110   "[W]here errors are not individually considered sufficiently egregious for an appellate court to grant the defendant a new trial, but the errors, nevertheless, create a pervasive pattern of unfair prejudice to the defendant's case, a new trial may be granted on the ground of cumulative error." *People v. Howell*, 358 Ill. App. 3d 512, 526 (2005). "However, the cumulative errors that warrant such an extreme result must themselves be extreme." *People v. Desantiago*, 365 Ill. App. 3d 855, 871 (2006). "There generally is no cumulative error where the alleged errors do not

amount to reversible error on any individual issue." *People v. Green*, 2017 IL App (1st) 152513, ¶ 118. Assuming *arguendo* that the trial court did unreasonably restrict the defense's closing argument, because defense counsel was still able to argue to the jury about defendant's lack of knowledge regarding an entry without authority and there were no other errors, there is no cumulative error in this case. See *id.*

¶ 111                                    G. One-Act, One-Crime

¶ 112   Although neither party raised a one-act, one-crime issue in their briefs, we briefly address it *sua sponte* because one-act, one-crime errors allow for the potential of surplus convictions and, thus, affect the integrity of the judicial process. See *People v. Harvey*, 211 Ill. 2d 368, 389 (2004). Under the one-act, one-crime doctrine, "[p]rejudice results to the defendant only in those instances where more than one offense is carved from the same physical act." *People v. King*, 66 Ill. 2d 551, 566 (1977). Here, defendant was convicted of two counts of home invasion (Counts XXXVII and XXXVIII) and sentenced to the minimum 21 years' imprisonment on each of those counts to be served concurrently. See 720 ILCS 5/12-11(a)(3), (c) (West 2010) (stating that a home invasion while armed with a firearm and using force or threatening the imminent use of force is a Class X felony "for which 15 years shall be added to the term of imprisonment imposed by the court"); 730 ILCS 5/5-4.5-25(a) (stating that the sentence for a Class X felony is between 6 and 30 years' imprisonment).

¶ 113   In *People v. Cole*, 172 Ill. 2d 85, 101-02 (1996), our supreme court held that, where a defendant made only one unauthorized entry into someone's home yet attacked two victims, he could be convicted of only one count of home invasion. In other words, the home invasion statute allows for only one conviction no matter the number of victims. *Id.* at 102. Subsequent to *Cole*, in *People v. Hicks*, 181 Ill. 2d 541, 544 (1998), our supreme court addressed the question

of how many home invasion convictions could stand when co-offenders make a simultaneous unauthorized entry. Relying on *Cole*, the court observed that, "[i]f the number of persons present in a home does not increase the number of convictions, we do not believe that the number of entrants into a home provides a valid basis for increasing the number of convictions." *Id.* at 549. As such, when two convictions for home invasion result from a simultaneous unauthorized entry into a dwelling place by co-offenders, only one conviction can ultimately stand for the defendant; otherwise, the "multiple convictions [would] violate[ ] the one-act, one-crime rule set forth in *King*." *Id.*

¶ 114    When two convictions violate the one-act, one-crime doctrine, the sentence should be imposed on the more serious offense, and the less serious offense should be vacated. *People v. Artis*, 232 Ill. 2d 156, 170 (2009). Where the punishments are the same for both offenses, as is the case here, the sentence should be imposed on the offense that "has the more culpable mental state." *In re Samantha V.*, 234 Ill. 2d 359, 379 (2009). We accordingly vacate defendant's conviction for home invasion based on Conner being the victim, which defendant was guilty of under a theory of accountability for Fisher's actions. See *People v. Denton*, 329 Ill. App. 3d 246, 253 (2002) (where the defendant was convicted and sentenced of two counts of home invasion, one based on his own conduct and one based on the conduct of an accomplice, the appellate court vacated the count based on the actions of his accomplice). We accordingly vacate defendant's conviction and sentence on count XXXVIII.

¶ 115                                    III. CONCLUSION

¶ 116    For the foregoing reasons, we vacate defendant's conviction and sentence on count XXXVIII but affirm in all other respects.

¶ 117    Affirmed in part and vacated in part.

**No. 1-16-3245**

| | |
|---|---|
| **Cite as:** | *People v. Carr-McKnight*, 2020 IL App (1st) 163245 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 11-CR-9070(02); the Hon. Mauricio Araujo, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Jonathan Pilsner, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and David Greenspan, Assistant State's Attorneys, of counsel), for the People. |

¶ 118