2024 IL App (1st) 230229-U

No. 1-23-0229

Order filed February 1, 2024

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Stephenson County. |
| | ) | |
| v. | ) | No. 06 CF 329 |
| | ) | |
| PHILLIP E. CHAMBERS, | ) | Honorable |
| | ) | Michael P. Bald, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Presiding Justice Rochford and Justice Ocasio concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm defendant's conviction for residential burglary over his contention that the State failed to prove his guilt beyond a reasonable doubt.

¶ 2    Following a bench trial, defendant Phillip E. Chambers was found guilty of residential burglary (720 ILCS 5/19-3(a) (West 2006)) and sentenced to six years' imprisonment. On appeal, Chambers contends that the State failed to prove him guilty beyond a reasonable doubt when it failed to establish that he intended to commit a crime. We affirm.[1]

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 3                                    I. BACKGROUND

¶ 4      Chambers was charged by complaint with one count of residential burglary and one count of theft of property exceeding $300, arising from an April 29, 2006 incident where he allegedly entered Gerald Siedenburg's house without authority and stole coins worth more than $300.[2]

¶ 5                                    A. State's Case

¶ 6                                    1. Sydney Aspinwall

¶ 7      Sydney Aspinwall (*née* Peters) and her family, the Peters, lived with Siedenburg at his residence located at 1700 Gladewood Drive in Freeport, Illinois for "[m]aybe a week" in 2006. Chambers was friends with Aspinwall's brother-in-law, Harley Reeder. Prior to their brief stay with Siedenburg, the Peters lived at Allen Kraus's residence.[3] While living with Kraus, Chambers visited "at least once or twice" with Reeder. Aspinwall remembered his visits because she "had a crush" on Chambers. At the Kraus residence, guests removed their shoes and left them on the landing. Aspinwall regularly rearranged said shoes because "her mom was a stickler" and would yell at her if there were too many shoes. Accordingly, Aspinwall "knew everybody's shoes at that house," and remembered that Chambers wore white K-Swiss shoes. After living with Siedenburg, the family moved temporarily to a house on Cleveland Street.

---

[2]The victim's first name is interchangeably referred to as Jerry and Gerry throughout the record on appeal, and his last name is also spelled Siedenberg. We adopt the spelling, Gerald Siedenburg, from the complaint.

   The complaint was superseded by an indictment filed on January 15, 2013, which additionally alleged that Chambers "was not usually and publically [*sic*] a resident of the State of Illinois for in excess of 4 years since the date of the offense." During pretrial proceedings on March 29, 2022, a stipulation was filed asserting that after Chambers's arrest on September 28, 2006, he escaped the police department during booking procedures and fled the state. The parties also stipulated that Chambers's absence from Illinois tolled the statute of limitations.

   The record establishes that Chambers entered a non-negotiated guilty plea to the escape charge in 2021 and, following a sentencing hearing, was sentenced to 30 months' probation and 120 days' periodic imprisonment.

[3]Aspinwall called Kraus her stepfather but clarified that he had dated her mother for 20 years.

¶ 8    On cross-examination, Aspinwall stated that after the Siedenburg burglary, she told a police officer that Chambers's only pair of shoes was a pair of K-Swiss shoes, size 11 to 13. Aspinwall recalled that Chambers wore K-Swiss branded shoes because "those were the only K-Swiss shoes in [Kraus's] home." On April 29, 2006, Reeder and Daniel Kaiser visited the house on Cleveland Street looking for Aspinwall's sister, Elizabeth Reeder (*née* Peters).[4] As Elizabeth was not there, they did not enter the house. She did not see Chambers with Kaiser and Reeder that evening. Reeder is married to Elizabeth, but Aspinwall does not "talk to" Elizabeth and was not trying to "stick this to Phillip to help Harley."

¶ 9                                    2. Daniel Kaiser

¶ 10    Daniel Kaiser, who was present during the April 2006 incident, testified at Chambers's trial. Kaiser was separately convicted of residential burglary "[o]n the grounds of accountability" for his role in the incident. He was ordered to pay restitution, which his parents paid for him. Kaiser agreed that, if Chambers were found guilty, his parents would like at least partial reimbursement for the restitution. At the time of Chambers's trial, Kaiser had pending charges in Wisconsin for possession and possession with intent to deliver. Kaiser agreed to testify "[t]o make sure justice was served the way that it was meant to be and should have been."

¶ 11    On April 29, 2006, Kaiser traveled to Siedenburg's residence twice. The first time, Kaiser picked up Chambers and his friend Harley Reeder, and visited Siedenburg's house to see if

---

[4]At the time, Elizabeth Reeder was Harley's girlfriend. At the time of Chambers's trial, they were married.

Elizabeth was present. Chambers and Reeder went up to the residence, Siedenburg answered the door, and the two men returned to the car. Nothing memorable happened during this first trip.[5]

¶ 12    Later that day, Kaiser was with his girlfriend, Kayla[6], when Chambers called Kayla and asked Kaiser and Kayla to drive Chambers and Reeder to "the Dells area" to search for work. After Kaiser picked up Chambers and Reeder, Chambers said that he needed to retrieve "clothes and some stuff" that he had left at Siedenburg's residence. Kaiser drove to the residence and parked in Siedenburg's driveway. Chambers approached the house and rang the doorbell, but there was no response. Chambers then walked to the back of the house. Five to ten minutes later, he returned to the vehicle and asked Kaiser to open the trunk so he could put a bag inside. After Chambers returned to the car, Chambers and Reeder asked Kaiser to stop at Cubs Foods, a grocery store. They explained they had collected coins that they wanted to exchange at a Coinstar machine.

¶ 13    After Chambers and Reeder were unable to exchange the coins at Cubs Foods, Kaiser drove to another grocery store, Logli Supermarket. Chambers brought his backpack into Logli and Kaiser observed that it was "a third to a quarter" full of coins. At Chambers's request, Kaiser assisted with the Coinstar machine, but they were unable to exchange the coins and had to ask a manager for help. Kaiser last saw Chambers that night when Kaiser dropped off Chambers and Reeder at a hotel in Wisconsin.

¶ 14    Kaiser spoke with Detective Matt Summers in 2006 but did not tell Summers about the second trip to Siedenburg's residence because Kaiser had heard rumors that "a burglary" had occurred and he did not want to "involve" himself in the crime. Kaiser had been "in trouble" with

---

[5]When Kaiser first spoke with a detective in 2020 regarding the events of April 29, 2006, he did not mention the first trip to Siedenburg's house. He stated it was 15 years prior and, as nothing had happened, he did not think to mention it initially.

[6]Kayla's last name is not in the record. She was his ex-girlfriend at the time of Chambers's trial.

Chambers before and was apprehensive about spending time with him. Kaiser denied receiving any "proceeds" from the burglary.

¶ 15    Kaiser identified photographs depicting the driveway and exterior of the Siedenburg residence.[7] Kaiser also identified surveillance footage from Logli and a photograph taken from the footage depicting him exiting the store with a soda.[8] The video, which Kaiser narrated, depicts Chambers and Kaiser enter the store and approach a Coinstar machine. Chambers carries a black backpack. They spend a few minutes operating the machine, periodically adding coins from the backpack. At one point, Chambers leaves to find a store employee who assists them with the machine. Eventually Kaiser walks further into the store, while Chambers stays with the machine. After a few more minutes, Chambers retrieves the bag and leaves the store.

¶ 16    On cross-examination, Kaiser stated that he had discussed reimbursement with the State and had been informed that, if Chambers were found guilty, the court would address whether his parents were to receive reimbursement. After the second trip to the Siedenburg residence, when Chambers returned to the vehicle with a bag, Kaiser had no reason to believe a crime had been committed. After Kaiser stated he wears a size 11 shoe, defense counsel asked Kaiser to place his foot next to Chambers's so the court could observe the difference in shoe size. The court noted that Kaiser's shoe "appears larger" than that of Chambers.

¶ 17    Kaiser had not spoken to Chambers for 2½ years before Chambers called Kayla to ask for a ride to the Dells on April 29, 2006. Kaiser could not recall if he told detectives in May 2006 that Reeder and Chambers had stayed at the Siedenburg house. Neither could he recall whether he told detectives that he, Chambers, and Reeder stopped at two grocery stores to use the restroom or if

---

[7]These photographs are included in the record on appeal and have been viewed by this court.

[8]The video is in the record on appeal and has also been viewed by this court.

he omitted that the group went to the stores with a backpack full of change to exchange. He did not mention Reeder to the detectives in May 2006 because they only asked him about Chambers. In 2020, Kaiser informed detectives that he was speaking with Reeder in the vehicle and did not hear sounds "of breaking or *** pounding" when Chambers went to the back of the house. On redirect examination, Kaiser testified that he never owned a pair of K-Swiss shoes.

¶ 18                                    3. Stipulations

¶ 19    The State entered a stipulation that Siedenburg did not authorize Chambers to enter his residence, and that Chambers did not admit to being inside the residence on the date in question.

¶ 20    The State also entered stipulated trial transcripts of witness testimonies from Kaiser's trial in Stephenson County case 06 CF 328. The transcripts were introduced at Chambers's trial and are included in their entirety in the record on appeal. The trial court read the witnesses' transcripts and then permitted defense counsel to state what questions he would have asked each witness on cross-examination, if they were present. Defense counsel then directed the court to parts of the transcripts that, according to counsel, contained the relevant answers. We summarize the stipulated testimonies of the witnesses, along with defense counsel's proposed cross-examination questions. These witnesses are Freeport police officer Kurtis Schnoor, Illinois State police sergeant Anthony Heindl, Gerald Siedenburg, Robert Brown, Richard Naze, and Freeport police officer Matthew Summers.

¶ 21                              a. Officer Kurtis Schnoor

¶ 22    At almost 10 p.m. on April 29, 2006, Schnoor responded to a call of a burglary at the Siedenburg residence. Siedenburg stated that his home had been broken into and a "jar" of coins and a duffle bag in his bedroom closet had been stolen. Schnoor observed damage to the door at the north end of the house, and "footwear impression[s]" in the hallway between the door and the

bedroom. The next day, Siedenburg called Schnoor to inform him that three cans of quarters were also missing, but Schnoor did not know if they were taken with the other coins. During his investigation, Schnoor discovered that attempts to exchange the coins had occurred at Logli and Cub Foods, and he contacted both establishments.

¶ 23    Schnoor identified photographs of the interior and exterior of the Siedenburg residence, which are included in the record on appeal. The photographs depict a damaged door and a shoe print on the floor.

¶ 24    On cross-examination, defense counsel would have asked Schnoor if Siedenburg later informed him that the duffle bag filled with silver coins was not missing, but rather, that Siedenburg had hidden it elsewhere. Defense counsel noted that Siedenburg testified that he remembered he had hidden the coins in another location. Defense counsel would also inquire if Siedenburg had informed Schnoor that he had allowed the Peters family to stay in his residence when he was on vacation; Schnoor would answer yes. Further, defense counsel would ask Schnoor if Siedenburg informed him that Sydney and Elizabeth Peters both had boyfriends who stayed at the residence with them, and that Sydney stayed in Siedenburg's bedroom when he was on vacation. Schnoor would answer yes. Lastly, defense counsel would ask Schnoor if Chambers was listed as a suspect; Schnoor would testify no.

¶ 25    In response to defense counsel's proposed questioning, the State would elicit testimony on re-direct that, according to Schnoor's police report, the shoe impression recovered at the scene was a larger size with an emblem in the middle of the tread consistent with a K-Swiss logo.

¶ 26                    b. Illinois Police Sergeant Anthony Heindl

¶ 27    Heindl photographed and processed the scene at Siedenburg's residence. He collected four latent lifts of footwear imprints inside the house and one outside near the "point of entry." Each

shoe print appeared to be from a K-Swiss shoe, and the trail led directly from the entry point to the foyer to the bedroom.

¶ 28                                    c. Gerald Siedenburg

¶ 29    In April 2006, Siedenburg allowed the Peters family to stay at his home while he and his wife were on vacation. By the time Siedenburg returned from vacation on April 18 or 19, the Peters family had moved to a rental house that Siedenburg owned. Siedenburg kept spare change in a five-gallon glass jar in the master bedroom closet; he also kept additional coins in empty coffee cans. On April 29, 2006, the jar was two-thirds full of change, worth over $300. At previous times, when the jar was half full of change, there was approximately $1200 in the jar.

¶ 30    On that day, Siedenburg returned from work and observed a vehicle in the driveway that he did not recognize. A person standing at the front door of the house approached Siedenburg and identified himself as Reeder. Siedenburg recognized him as the boyfriend of "one of the Peters girls." Reeder said he was looking for the girls, and Siedenburg informed him that they did not live there anymore. Siedenburg thought that the situation was strange, because the man had been living with the Peters family during that time and knew they had moved. Reeder returned to the vehicle, which had several other people inside, and left.

¶ 31    Later, Siedenburg went out to dinner, after locking the doors to his house. When Siedenburg returned at approximately 9:15 p.m., he observed a piece of trim hanging from his back door, which was not broken before he left. The glass jar of coins was missing from his closet. Siedenburg subsequently discovered that the coffee cans containing other coins were also missing, but that his silver coins hidden elsewhere had not been taken.

¶ 32    On cross-examination, defense counsel would have asked whether Reeder spent the night at Siedenburg's house; Siedenburg would answer affirmatively.

¶ 33                    d. Logli Manager Robert Brown

¶ 34    Brown was familiar with the store's surveillance system and identified a CD containing surveillance footage from the store depicting two men using the Coinstar machine on April 29, 2006, at 11:15 p.m.

¶ 35                    e. Logli Assistant Manager Richard Naze

¶ 36    Naze likewise identified the CD containing the video of the Coinstar machine on April 29, 2006. Naze identified himself in the video and testified that the video accurately depicted the events of the evening. Naze recalled that two men asked for his assistance in operating the machine, because they were exchanging an "exceptional amount of coins" and were unable to redeem the voucher until the next day. Naze identified still photographs from the video, which are included in the record on appeal and have been viewed by this court.

¶ 37                    f. Freeport Police Officer Matthew Summers

¶ 38    Summers viewed the Logli surveillance video and identified Kaiser and Chambers operating the Coinstar machine. Excerpts from redacted police reports state that on May 2, 2006, Reeder spoke with Summers about the burglary, and Summers "looked at the bottom of *** Reeder's shoes and they were not the same tread design as the footwear that was obtained at the scene."

¶ 39    On cross-examination, defense counsel would have asked Summers if, pursuant to his investigation, he had spoken with Tom Rogozinski and Paul Martin, employees of Cub Foods, who told Summers that two men came to the store on April 29 at around 11:52 p.m.[9] Rogozinski

---

[9]Because defense counsel would question Summers on matters outside of the scope of the direct examination, the State stipulated that Summers would be called as a new witness with the cross-examination being presented as if the State had rested its case-in-chief.

and Martin told Summers that the men were able to "cash out," and Martin provided Summers with a receipt that was signed during the transaction, which is included in the record on appeal. The Coinstar receipt displays the total value of the coins processed as $334.28 with a processing fee of $29.75, showing that the value received was $304.53. The signature on the back of the receipt is Reeder's.

¶ 40                                            4. Other Evidence

¶ 41    The State introduced certified copies of Reeder's charging document, sentencing order, and release from probation related to the incident. The documents indicate that Reeder was charged with theft on September 21, 2006. He pleaded guilty on December 15, 2006, and was sentenced to 178 days' imprisonment and ordered to pay restitution. The restitution ordered was joint and several with Kaiser's and Chambers's cases, totaling $3515.

¶ 42    The State also asked the court to take judicial notice of Chambers's escape conviction in case 06 CF 341. Lastly, the State offered the stipulated testimony of Schnoor, who would testify that he was familiar with Reeder in 2006, and described him as white, non-Hispanic, 5'9", and 160 pounds.

¶ 43                                            B. Defense Case

¶ 44                                            1. Stipulation

¶ 45    Defense counsel introduced a stipulation that forensic scientist Stephanie Bodine would testify that she compared fingerprint samples from Reeder, Chambers, and Kaiser to latent fingerprint lifts recovered by Heindl, and found no match.

¶ 46                                            2. Phillip Chambers

¶ 47    Chambers was 5'5" in 2006, weighed 140 pounds "at most," and wore a size 8 shoe, but he did not recall the brand. Chambers wore a smaller shoe size than Kaiser, who was size 11, and was shorter and weighed less than Reeder.

¶ 48    Chambers had never been inside Siedenburg's home and did not enter it on April 29, 2006. That day, Reeder called Chambers at "midday." Chambers told Reeder he would "come smoke weed" with him if he could get a ride to go see Reeder. Later that day, Kaiser and Kayla arrived unannounced at Chambers's house. Chambers informed Kaiser that he was seeking employment in Wisconsin Dells and asked Kaiser for a ride to Wisconsin. Kaiser agreed. Chambers brought a bag filled with his belongings, and Kaiser drove to Reeder's house.

¶ 49    Reeder asked Kaiser if he could come as well, and Kaiser drove to Reeder's girlfriend's house, where Reeder had been staying. Reeder gave Kaiser directions, and Kaiser drove to a house Chambers was unfamiliar with. They arrived at 4:30 to 5 p.m. and parked in the driveway. Reeder exited the vehicle and approached the front door, at which point another vehicle arrived; Reeder spoke with the driver for a few seconds. Both Reeder and the driver returned to their vehicles, and Kaiser drove to Reeder's house.

¶ 50    Approximately an hour later, Chambers, Kaiser, and Reeder returned to Reeder's girlfriend's house to get Reeder's clothes. When they arrived, Reeder asked for Chambers's assistance to carry some of his belongings and asked Chambers to wait near the front door. Reeder then walked to the rear of the house, and informed Chamber s that his key was "for the back door."

¶ 51    Chambers waited for approximately five minutes, and Reeder returned through the front door with an armful of clothes and a black bag, the latter of which he handed to Chambers. Reeder signaled to Kaiser to open the trunk, and they walked toward the open trunk. Chambers returned

the bag to Reeder, turned around, and reentered the vehicle. Reeder returned to the vehicle as well and stated that he "needed to stop for cash for his travels."

¶ 52     They first stopped in a store in Freeport. Reeder exited the vehicle and removed his backpack from the trunk. Reeder returned without money, and they left. Next, the vehicle traveled through Rockford, and they stopped at Logli, upon Reeder's request. Chambers and Kaiser exited the vehicle to exchange the coins for cash, on behalf of Reeder, and Reeder stayed in the vehicle. While in Logli, Chambers attempted to load change into the Coinstar machine with the assistance of an employee but was unsuccessful. Chambers exited the store 10 to 15 minutes later with the bag, returned to the vehicle, and told Reeder that the machine did not "work."

¶ 53     They continued driving toward Wisconsin Dells and stopped at Cub Foods. Reeder entered the store with the bag alone because Chambers refused to continue to help Reeder attempt to exchange his money. After leaving the store, they continued to drive to Wisconsin Dells. Chambers testified that the coins which were exchanged were Reeder's. Chambers believed the purpose of going to Siedenburg's house was for Reeder to retrieve clothes and belongings, and Chambers believed Reeder when he said his key was for the back door.

¶ 54     Chambers was subsequently arrested but walked out of the police station and "left the state." Chambers explained that he was "young and dumb" and was afraid to get into trouble and go to jail for something he did not do. Chambers returned after 14 years to "clear" his name and see his family.

¶ 55     On cross-examination, Chambers stated that he never entered Siedenburg's residence, and never had authority to do so. When Chambers went with Reeder to retrieve Reeder's clothes from the residence, Chambers believed Reeder had stayed at the residence "for a few days" with his girlfriend. Chambers did not know why Reeder left without his clothing the first time they went to

the house. When they returned to Siedenburg's residence, Reeder did not inform Chambers that he intended to break into the residence to steal change nor did he give any "indication" that he was "up to no good." Later, when Chambers carried the black bag that Reeder brought from Siedenburg's house, Chambers recalled the bag weighed "less than a circular saw" and was filled with two to three inches of change.

¶ 56    There was nothing to lead Chambers to believe that Kaiser would have formed a different opinion about Reeder's purpose for entering Siedenburg's residence. On April 29, 2006, Chambers and Kaiser were friends. The State asked Chambers if he recalled a fight with Kaiser or knew of any reason Kaiser would be angry with him. Chambers responded that he was "pretty sure" that Kaiser discovered that Chambers and Kaiser's girlfriend, Kayla, had "sexual relations" after Chambers was in Wisconsin Dells.

¶ 57    Chambers did not recall telling detectives, including Summers, on September 11, 2006, that he did not exchange coins for cash in Rockford. Chambers viewed the surveillance footage from Logli with the detectives and stated that he and Kaiser went to a Coinstar machine in a grocery store. Chambers did not recall if he told Summers where he had gotten the change. Chambers also did not recall telling Summers that although Chambers did not know about a residential burglary, Reeder informed him that he "knew where to get some money," so that Chambers could see his sister. Reeder did not want to leave the area because his girlfriend was pregnant. The backpack that Chambers took from the threshold of the Siedenburg residence was black and weighed about two to three pounds. The black backpack retrieved from the trunk had coins inside and looked "[s]imilar or the same" to the bag retrieved from the threshold. At the time Chambers attempted to exchange the coins, he believed that they belonged to Reeder. When they arrived at Wisconsin

Dells, Reeder and Chambers paid for a hotel room for the four of them; Reeder paid his share with cash.

¶ 58    Regarding his escape conviction, Chambers left the police station because he knew he was under arrest for a residential burglary, and fled because he did not "want to be in jail." Chambers did not think ahead and agreed that he was "on the run" for 14 years with no contact with his family and used an alias during that time.

¶ 59    On redirect examination, Chambers testified that in 2006, his sisters lived in Chicago and Freeport, but he did not have a close relationship with them and did not need money to visit them.

¶ 60    In rebuttal, the State presented a stipulation that Summers would testify he asked Chambers on September 11, 2006, if Chambers had exchanged coins for cash in Rockford. Chambers stated he did not and had never been to Rockford. Summers then showed Chambers surveillance photos of him and Kaiser going to Logli in Rockford, and Chambers stated that he did exchange change with Kaiser in April. Chambers told Summers that Kaiser gave Chambers the change and wanted to exchange it, and Chambers only assisted Kaiser because Kaiser did not know how to operate the machine. Chambers stated he never went inside Cub Foods with Reeder, and Reeder was not with him in Rockford. Chambers told Summers that he and Kaiser returned home after going to Rockford. Chambers knew of a residence that Reeder's girlfriend "was at," but Chambers had never been there. Chambers did not know anything about a residential burglary. Prior to April 29, Reeder told Chambers he knew where to get money so that Chambers could visit his sister. Reeder did not want to leave the area because his girlfriend was pregnant. Chambers denied involvement in a burglary and stated the coins he exchanged in Rockford belonged to Kaiser, although he did not know where they came from.

¶ 61    In surrebuttal, Chambers testified he did not recall if he told Summers that the coins belonged to Kaiser or Reeder.

¶ 62    In closing, defense counsel argued that the State could not prove Chambers wore shoes that matched the shoe impression inside the house, because Chambers wore a size 8 shoe. To that point, counsel argued that Aspinwall was not credible when she testified that Chambers wore size 11 to 13 K-Swiss shoes in 2006 and noted that Aspinwall's sister was married to Reeder. Counsel argued that Kaiser was not credible, both because his parents wanted to be reimbursed for the restitution and the record established that Kaiser repeatedly lied to the police. Counsel further argued that the State did not establish Chambers was not operating under a mistake of fact about the purpose for going to the Siedenburg residence and later exchanging the coins.

¶ 63                                C. Court's Finding

¶ 64    The court found Chambers guilty of residential burglary and theft. In ruling, the court noted that Aspinwall's testimony was "not persuasive enough" for the court to conclude that Chambers entered the residence. The court found that Kaiser's and Chambers's testimonies were impeached by Kaiser's prior criminal convictions and Chambers's status as a felon, respectively. The court found that Kaiser's testimony was believable in part but viewed it with the suspicion required for accomplice testimony. Chambers's testimony was not credible "for the most part" due to his manner of testifying and avoiding answers, and his prior conviction.

¶ 65    The court further concluded that no witness established the shoe size of the burglar, so arguments about shoe size comparisons were "of little value." Regardless, Chambers was legally accountable for burglary, because the evidence demonstrated that Chambers, Reeder, and Kaiser "hatched" the burglary plan at some point during the afternoon and evening of April 29, 2006. The court noted that "[Hood] may very well have been the sole individual who had made entry to ***

[the residence] but he was at least accountable for the entry and helped carry away the backpack with the coins." Further, Chambers was seen in control of $300 in coins and assisted Kaiser in exchanging the coins for cash. The court noted that the group then stayed in the Dells area, "no doubt funded in part by the proceeds of the burglary."

¶ 66    Defense counsel filed a motion for a new trial, arguing the evidence did not establish that Chambers committed theft or residential burglary, and that the State failed to disprove Chambers's assertion that he was acting under a mistake of fact. Following a hearing, the court denied Chambers's motion and noted that during the first visit to Siedenburg's residence, Siedenburg informed Reeder that there was no reason for him to be at the house. Siedenburg explained that the family that had lived there had moved, so Chambers could not rely upon a mistake of fact that Reeder had permission to enter the house.

¶ 67    After a sentencing hearing, the court merged the theft charge into the residential burglary charge and sentenced Chambers to six years' imprisonment. Chambers did not file a motion to reconsider sentence.

¶ 68                                    II. ANALYSIS

¶ 69    On appeal, Chambers argues the State failed to prove him guilty of residential burglary because he mistakenly believed that he was assisting a friend to remove items from Siedenburg's residence.

¶ 70    The standard of review for a challenge to the sufficiency of the evidence is "whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks and emphasis omitted.) *People v. Belknap*, 2014 IL 117094, ¶ 67. The trier of fact resolves conflicts in the testimony, weighs the evidence, and draws reasonable inferences from basic facts to ultimate

facts. *People v. Brown*, 2013 IL 114196, ¶ 48. Accordingly, this court will not retry a defendant or substitute its judgment for that of the trier of fact on the weight of the evidence or the credibility of witnesses. *Id*. A reviewing court must allow all reasonable inferences from the record in favor of the prosecution (*People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)), and will not reverse a conviction unless the evidence is "unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the Chambers's guilt." (*People v. Jackson*, 232 Ill. 2d 246, 281 (2009) (internal quotation marks omitted)).

¶ 71 To prove residential burglary as charged, the State had to prove that Chambers, knowingly and without authority, entered or remained in Siedenburg's dwelling place with the intent to commit a felony or theft therein. 720 ILCS 5/19-3(a) (West 2006). Chambers challenges only the intent element of the offense.

¶ 72 The trial court observed that if Chambers did not commit residential burglary himself, he could still be legally accountable for the offense. A person is legally accountable for the conduct of another person if "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2006). Pursuant to the statute, the State may prove a defendant's intent by showing either that he shared the criminal intent of the principal or that there was a common criminal design. *People v. Fernandez*, 2014 IL 115527, ¶ 21. If a defendant engages in a common criminal design, any acts in furtherance of that common design are considered to be acts of all parties and all parties are equally responsible for the consequences of further acts. *Id.* ¶ 13.

¶ 73 "In order to demonstrate accountability, the State need not present evidence of a verbal agreement between co-offenders, nor show that the defendant directly participated in the

perpetration of the criminal act." (Internal citations omitted.) *People v. Carr-McKnight*, 2020 IL App (1st) 163245, ¶ 67. Rather, a common design may be inferred from the circumstances surrounding the crime. *People v. Cowart*, 2017 IL App (1st) 113085-B, ¶ 34. However, a defendant's "mere presence" at the scene is insufficient to establish accountability, even if coupled with the defendant's flight from the scene or knowledge that a crime has been committed. *People v. Johnson*, 2021 IL App (1st) 171885, ¶ 88.

¶ 74 Viewing the evidence in the light most favorable to the State, a rational trier of fact could find that Chambers was guilty of residential burglary under an accountability theory. The State presented evidence that Chambers traveled with Reeder and Kaiser to Siedenburg's residence twice on April 29, 2006. The second time, Chambers assisted Reeder in carrying over $300 worth of coins from the residence and traveled to different stores to exchange the coins for cash, before traveling to Wisconsin Dells. Further, Chambers was arrested in September 2006, and during booking procedures left the police station and fled Illinois for 14 years.

¶ 75 Chambers nevertheless contends that the State did not establish he intended to commit a theft inside Siedenburg's residence or that he was accountable for someone who did. Chambers first argues the evidence was insufficient to prove he entered Siedenburg's residence. He notes that Kaiser's testimony was "thoroughly impeached" by Kaiser's conviction and status as an accomplice, inconsistencies in his previous statements to the police, and bias against Chambers. Further, Chambers alleges the State did not establish his accountability because it did not prove that he intended to facilitate a crime and no evidence supported a plan between Chambers, Kaiser, and Reeder to steal the coins. Chambers argues that defense counsel offered the affirmative defense of mistake of fact during the proceedings to negate the mental state of intent, and the State did not meet its burden of proving beyond a reasonable doubt that Chambers intended to commit the theft.

¶ 76    Chambers's contention that Kaiser's testimony was incredible is nothing more than a request for this court to reweigh the evidence and independently assess Kaiser's credibility. The trial court specifically noted that Kaiser's testimony was impeached and was viewed with suspicion because of his status as an accomplice, but that it nonetheless believed the testimony in part. "[I]t is for the fact finder to judge how flaws in part of the testimony affect the credibility of the whole." *Cunningham*, 212 Ill. 2d at 283. Moreover, "[t]he trier of fact may accept or reject all or part of a witness's testimony." *People v. Corral*, 2019 IL App (1st) 171501, ¶ 85. The court heard Kaiser's testimony, including the inconsistencies, and found it believable in part, whereas the court concluded that Chambers's testimony was not believable "for the most part." We find no reason to disturb the court's credibility determinations. See *Brown*, 2013 IL 114196, ¶ 48.

¶ 77    Nevertheless, even discounting Kaiser's testimony that Chambers entered Siedenburg's residence, the record is sufficient to establish that Chambers was accountable for the theft. Chambers contends he raised the affirmative defense of mistake of fact, as he testified that he believed Reeder had permission to enter the residence and believed the coins he helped exchange belonged to Reeder. However, Chambers offers only his own testimony to support his purported mistake of fact. See *People v. Probst*, 344 Ill. App. 3d 378, 386 (2003) (finding the defendant's testimony alone insufficient to establish the affirmative defense of mistake of fact). "When a defendant elects to explain the circumstances of a crime, he is bound to tell a reasonable story or be judged by its improbabilities and inconsistencies." *People v. Nyberg*, 275 Ill. App. 3d 570 (1995). The court listened to Chambers's testimony and found that he was not credible. Again, we decline to disturb the court's credibility finding. See *Brown*, 2013 IL 114196, ¶ 48.

¶ 78    Further, the totality of the evidence supports the reasonable inference that Chambers colluded with Kaiser and Reeder to steal the coins. Although no testimony established a specific

plan between the men, evidence of a "verbal agreement" is not required. See *Carr-McKnight*, 2020 IL App (1st) 163245, ¶ 67. The evidence against Chambers is circumstantial, but reasonable inferences about his assistance may be drawn from it. See *Cowart*, 2017 IL App (1st) 113085-B, ¶ 34. The State presented evidence that, before April 29, 2006, Reeder had informed Chambers that he "knew where to get some money." Chambers, Reeder, and Kaiser then traveled to Siedenburg's house for the first time but were met by Siedenburg. On the second occasion they traveled to the residence, they retrieved a bag containing over $300 worth of coins. Afterward, Chambers handled the bag containing the coins and the men traveled to multiple Coinstar machines to exchange the coins for cash. It is undisputed that Chambers personally assisted in using the Coinstar machines. See *People v. Jointer*, 180 Ill. App. 3d 364, 369-70 (1989) (the court found the defendant legally accountable for a burglary of a railroad car where the defendant received and carried away proceeds from the burglary). Additionally, when Chambers was arrested for the offense, he fled the police station and did not return to the state until 14 years later. Flight is not dispositive but provides evidence of Chambers's consciousness of guilt. See *People v. Aljohani*, 2021 IL App (1st) 190692, ¶¶ 96-100 (although the mere presence of the defendant at the scene, coupled with his flight or knowledge of the crime, is not sufficient to establish accountability, flight from police may be considered in conjunction with other circumstantial evidence).

¶ 79 The State presented evidence that raises the reasonable inference that Chambers, Kaiser, and Reeder planned, executed, and shared the proceeds of the burglary. The trial court was not required to accept any possible explanation compatible with Chambers's innocence and elevate it to reasonable doubt. See *People v. Harris*, 2023 IL App (1st) 210754, ¶ 77. We find the inferences drawn by the trial court to be supported by the evidence, and thus do not disturb them. See *Brown*, 2013 IL 114196, ¶ 48.

¶ 80                               III. CONCLUSION

¶ 81    The evidence supporting Chambers's conviction for residential burglary is not so unreasonable or improbable as to create a reasonable doubt of his guilt. Accordingly, we affirm the judgment of the circuit court of Stephenson County.

¶ 82    Affirmed.