2024 IL App (1st) 220979-U

FIFTH DIVISION
December 27, 2024

No. 1-22-0979

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 09070 |
| | ) | |
| AMELIA CARR-McKNIGHT, | ) | Honorable |
| | ) | Maria Kuriakos-Ciesil, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Oden Johnson and Navarro concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The summary dismissal of defendant's postconviction petition is reversed, and the cause remanded for second-stage postconviction proceedings, where defendant made an arguable claim that her due process rights were violated when she was convicted of a charge that was never submitted to the jury.

¶ 2    After a jury trial, defendant Amelia Carr-McKnight was convicted of first degree murder and two counts of home invasion, and sentenced to a total of 51 years in prison—21 years on each home invasion count, to run concurrently with one another, and 30 years for the murder, to run consecutively to the home invasion sentences. On direct appeal, we vacated one of the home

invasion counts under the one-act, one crime rule. *People v. Carr-McKnight*, 2020 IL App (1st) 163245, ¶ 114.

¶ 3    Amelia has filed a petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)). On appeal from the summary dismissal of that petition, Amelia argues that the circuit court erred in dismissing her petition because (1) she made an arguable claim that her right to due process was denied when a conviction for home invasion, with the victim being Arkyisha Sloan-Carr, was entered against her that was never submitted to the jury or found proven beyond a reasonable doubt, (2) she made an arguable claim that her rights to a fair trial and conflict-free counsel were violated when the trial judge held the threat of sanctions against her trial counsel throughout the jury trial; and (3) the circuit court failed to address more than half of her claims within the 90 days required by the Act (see 725 ILCS 5/122-2.1(a)(2) (West 2022)). Because we agree that Amelia has shown she has an arguable claim that her due process rights were violated when she was convicted of a charge of home invasion, with Arkyisha Sloan-Carr as the victim, that was not submitted to the jury, we reverse and remand for second-stage proceedings.

¶ 4                                    I. BACKGROUND

¶ 5                                    A. Trial Proceedings

¶ 6    Because we discussed the facts in detail in our direct appeal, we recite them here only briefly, as needed for an understanding of the dispositive issue in this appeal. In addition, as several of the witnesses have similar or identical last names, we refer to everyone by their first name and have altered direct quotations from this court's prior decision accordingly.

¶ 7    A grand jury indicted Amelia and her codefendant Marvell Fisher with 50 counts in total, including first degree murder, armed robbery, home invasion, and residential burglary, based on the April 14, 2011, shooting death of Jamar Conner. Amelia and Marvell had separate trials. The

State proceeded to trial against Amelia on five counts: three counts of first degree murder (counts 1, 2, and 4) and two counts of home invasion (counts 37 and 38). Count 37 specifically alleged that Amelia and Marvell committed home invasion when they without authority and while armed with a firearm, knowingly entered Arkyisha Sloan-Carr's residence, knew or had reason to know that one or more people were present, and used force or threatened the imminent use of force upon Arkyisha Sloan-Carr within her residence. The allegations in count 38 were substantially the same except that Amelia and Marvell were alleged to have used force or threatened the imminent use of force upon Jamar Conner.

¶ 8 The evidence presented by the State at trial showed that in April 2011, Arkyisha had been receiving social security checks as the payee on behalf of her estranged husband, and Amelia's brother, Cedric Carr. At that time, Cedric was in county jail, and Arkyisha was living with her boyfriend, Jamar, and her two children in a third-floor apartment in Chicago.

¶ 9 On April 14, 2011, Arkyisha received one of Cedric's social security checks. According to one of Amelia's sons, Jeremiah, later that day, he, Amelia, her boyfriend Marvell, and Amelia's other two children all went to Arkyisha's apartment. They drove, and although all five entered the apartment building, only Jeremiah, Amelia, and Marvell went to the third floor. Jeremiah stayed by the stairway and Amelia and Marvell went to the apartment's front door.

¶ 10 As stated in our prior opinion:

> "It was around 3:40 p.m., and Arkyisha, Jamar and her children were in their apartment. Arkyisha and Jamar were watching television in their bedroom, while her children were taking naps in another bedroom. Arkyisha heard a knock at the front door of her apartment, went to the door, looked through the peephole, and observed Amelia and Jeremiah. Arkyisha walked back toward the bedroom and told Jamar that it was Amelia at

the door and to ignore her, thinking that Amelia would eventually leave. According to Jeremiah, after Amelia knocked and received no answer, she tried to hear if anyone was inside. Jeremiah heard noises and what appeared to be arguing inside. Meanwhile, Arkyisha observed Jamar stand up, walk to the door and open the door a little bit. Both Arkyisha and Jeremiah observed that Jamar began to have a conversation with Amelia. Amelia asked Jamar where Arkyisha was, but Jamar asserted that Arkyisha was not there. Amelia told Jamar she heard Arkyisha in the apartment, but Jamar again asserted that Arkyisha was not there.

According to Arkyisha, after Jamar, who had nothing in his hands, again asserted that she was not there, Amelia suddenly 'bum rushed' the door and entered the apartment followed by Marvell, both without permission. Immediately after Amelia and Marvell were inside, Marvell began wrestling with Jamar. Arkyisha grabbed Jamar's cell phone to call the police. As she grabbed the phone, Arkyisha could not see Amelia but observed that Marvell was beginning to overpower Jamar near the front door. While Arkyisha attempted to 'work' Jamar's phone, *** she heard a gunshot. Arkyisha testified that she never had a firearm inside her apartment. After hearing the gunshot, she ran to her children's bedroom and locked the door.

Inside her children's bedroom, Arkyisha was able to open the phone and dial 911. Suddenly, Amelia 'kicked the door in' and grabbed the phone from Arkyisha's hand. Amelia slammed the cell phone down, put it in her pocket, and began yelling about the social security disability check. *** Although Arkyisha did not see where he came from, Jeremiah had entered the room. Amelia told him to 'go get my gun' because she was 'fitting to kill' Arkyisha. Shortly afterward, Arkyisha heard a young male voice say that someone

4

had called the police. Upon hearing that, Amelia looked at Arkyisha and said 'I'll be back for you.' Amelia and Jeremiah then left the apartment.

However, according to Jeremiah, after Amelia told Jamar that she heard Arkyisha in the apartment, Jamar tried to shut the door on Amelia. But she pushed back and forced her way into the apartment. Jamar then 'tried to hit' Amelia, and they began fighting. Marvell followed Amelia into the apartment and began fighting with Jamar, as well. Jeremiah, meanwhile, stood by the front door. *** Sometime into the fighting, Jeremiah heard a gunshot. At trial, when asked who fired the gun, Jeremiah asserted that it was Marvell because when they had exited the vehicle *** a few minutes earlier, Jeremiah observed 'something in his hand.' Jeremiah observed that Amelia was near Marvell when the gunshot went off, but Jeremiah never observed her touch a firearm.

After hearing a gunshot, Marvell and Jamar continued their fighting, which eventually moved outside the apartment and into a stairwell, where Jeremiah observed a bloodied Jamar begin to fall down the stairs. After witnessing this, Jeremiah went into Arkyisha's apartment and walked into a bedroom where Amelia, Arkyisha, and her children were located. Appearing to be upset, Amelia told Arkyisha that she had to 'go cash this check.' Arkyisha refused, so Amelia and Jeremiah left the apartment. At trial, Jeremiah denied that Amelia ever asked him to retrieve a firearm. Upon exiting the apartment building, Jeremiah observed Jamar on the ground bleeding and barely moving, appearing as if 'he was dead.' " *Carr-McKnight*, 2020 IL App (1st) 163245, ¶¶ 9-13.

¶ 11 Amelia and her three children left by the car they had arrived in. Eventually, Arkyisha went looking for Jamar and found him outside, on the ground and coughing up blood. A neighbor had called 911 and allowed Arkyisha to speak to the 911 operator. Jamar was taken to the hospital

where he died from "a single gunshot wound that entered his right arm which then pierced part of his right lung and heart." *Id.* ¶ 19.

¶ 12    In closing argument, the State read the agreed-upon instructions for home invasion which, in relevant part, stated that "[w]hile armed with a dangerous weapon the defendant used force on Jamar Conner, a person within the dwelling place." The State further argued, "Arkyisha told you Jamar was there. Jamar ran out. *** He was there, force was used on him. A gunshot, using a gun on someone, and that's force. We proved all five elements of home invasion, folks." Approximately nine pages later in the transcript, the State also argued, "One thing to keep in mind is Jamar is not the only victim of a home invasion here. Arkyisha is, too."

¶ 13    After closing arguments, the trial court instructed the jury. One instruction was that "[n]either opening statements nor closing arguments are evidence." Only two instructions with respect to the charges of home invasion were given. First, the court instructed the jury:

> "A person commits the offense of home invasion when he, not being a police officer acting in the line of duty, without authority, knowingly enters the dwelling place of another when he knows or has reason to know that one or more persons is present, and intentionally causes any injury to any person within the dwelling place."

The second instruction on home invasion was:

> "To sustain the charge of home invasion, the State must prove the following propositions:
>
> First: That the defendant, or one for whose conduct he is legally responsible, was not a police officer acting in the line of duty; and
>
> Second: That the defendant, or one for whose conduct he is legally responsible, knowingly and without authority entered the dwelling place of another; and

Third: That when the defendant, or one for whose conduct he is legally responsible, entered the dwelling place he knew or had reason to know that one or more persons was present; and

Fourth: That the defendant, or one for whose conduct he is legally responsible, was armed with a dangerous weapon; and

Fifth: That while armed with a dangerous weapon the defendant, or one for whose conduct he is legally responsible, used force on *Jamar Conner*, a person within the dwelling place." (Emphasis added.)

¶ 14    After deliberating, the jury found Amelia guilty of first degree murder and home invasion. The signed verdict form for home invasion did not specify a victim; it simply stated, "We, the jury, find the defendant, Amelia Carr-McKnight, Guilty of Home Invasion."

¶ 15    Amelia's motion for a new trial was denied. The trial court then sentenced her to 30 years in prison for murder, and 21 years in prison on two counts of home invasion, with the sentences for home invasion to run concurrently with each other and consecutively to the sentence for first degree murder.

¶ 16                                    B. Direct Appeal

¶ 17    On direct appeal, Amelia raised several trial-related issues, including that the evidence was insufficient to prove her guilty of her convictions beyond a reasonable doubt. *Id.* ¶ 1. This court found the trial evidence was sufficient to sustain her convictions. *Id.* ¶¶ 50-75. However, this court also *sua sponte* vacated Amelia's conviction on count 38 under the one-act, one-crime doctrine— the count in which Jamar Conner was the victim. *Id.* ¶¶ 115-116. The court did so despite acknowledging in a footnote that while the State proceeded to trial against Amelia on count 37— the count in which Arkyisha Sloan-Carr was the victim—and the trial court sentenced her on that

count, "the jury instructions mentioned only [Jamar] Conner as a victim, and there was only one set of verdict forms concerning home invasion." *Id.* ¶ 74, n.3. We affirmed Amelia's convictions in all other respects. *Id.* ¶ 2.

¶ 18                                    C. Postconviction Proceedings

¶ 19    On February 24, 2022, Amelia filed a petition for relief under the Act. In it, she alleged 16 claims, including as relevant here, a "Failure To Offer a proper Instruction To Jury." Amelia alleged that the State went to trial on count 37 and the trial court sentenced her on that count even though "the jury instructions only mention Jamar Conner as a victim" and "[t]here was only one set of verdict forms concerning home invasion." Amelia further alleged that the appellate court vacated count 38, but she "was never given the right to be brought back to court to receive this charge that was not originally given to a jury at trial but charge with."

¶ 20    On May 23, 2022, the circuit court summarily dismissed Amelia's petition in a lengthy written order, specifically addressing seven of her claims. As to Amelia's allegations that the jury was not instructed on the home invasion charge with Arkyisha Sloan-Carr as the victim, the court first found the issue to be forfeited because Amelia "could have easily raised this issue on appeal." The court also found the claim failed on the merits because the "charge was presented to the jury and [Amelia] was convicted."

¶ 21    This appeal followed.

¶ 22                                    II. JURISDICTION

¶ 23    The circuit court dismissed Amelia's postconviction petition on May 23, 2022. On December 8, 2022, Amelia filed a motion for leave to file a late notice of appeal, which we granted on December 21, 2022. We have jurisdiction over this appeal pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6), and Illinois Supreme Court Rule 606 (eff.

March 12, 2021) and Rule 651(a) (eff. July 1, 2017), governing appeals from final judgments in postconviction proceedings.

¶ 24                                    III. ANALYSIS

¶ 25    The Act (725 ILCS 5/122-1 *et seq.* (West 2020)) allows a criminal defendant to challenge his or her conviction by establishing that "in the proceedings which resulted in [the] conviction there was a substantial denial of his or her rights under the Constitution of the United States or the State of Illinois or both." *Id.* § 122-1(a)(1). Postconviction proceedings occur in three stages. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). At the first stage, which is the stage at issue in this case, the circuit court determines, without input from the State, whether a petition is frivolous or patently without merit. *Id.*; 725 ILCS 5/122-2.1(a)(2) (West 2020). If the petition is advanced to the second stage, the court appoints counsel to represent the defendant and, if necessary, to file an amended petition; at this stage, the State must either move to dismiss or answer the petition. *Gaultney*, 174 Ill. 2d at 418; 725 ILCS 5/122-4, 122-5 (West 2020). If the defendant then makes a substantial showing of a constitutional violation, they proceed to the third and final stage, an evidentiary hearing on the merits. *People v. Tate*, 2012 IL 112214, ¶ 10; 725 ILCS 5/122-6 (West 2020)).

¶ 26    At the first stage of proceedings, "[a] post-conviction petition is considered frivolous or patently without merit" "only if the allegations in the petition, taken as true and liberally construed, fail to present the 'gist of a constitutional claim.' " *People v. Edwards*, 197 Ill. 2d 239, 244 (2001) (quoting *Gaultney*, 174 Ill. 2d at 418). We review the summary dismissal of a petition *de novo*. *People v. Brown*, 236 Ill. 2d 175, 184 (2010).

¶ 27    On appeal, Amelia first argues that the circuit court erred in summarily dismissing her postconviction petition because she made an arguable claim that her right to due process was

denied when a conviction for home invasion was entered against her without ever being submitted to the jury or found proven beyond a reasonable doubt. We agree.

¶ 28   There are a few general principles that guide our decision. First, a defendant's fifth and sixth amendment rights to due process and a jury trial "require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which [s]he is charged, beyond a reasonable doubt." *U.S. v. Gaudin*, 515 U.S. 506, 509-10 (1995); see also US. Const., amends. V, VI. In addition, the right to a jury trial "includes, of course, as its most important element, the right to have the jury, rather than the judge, reach the requisite finding of 'guilty.' " *Sullivan v. Louisiana*, 508 U.S. 275, 277 (1993). Taken together, a defendant is entitled to "a jury verdict of guilty beyond a reasonable doubt." *Id.* at 278. In Illinois, our supreme court has said that a verdict should be set aside where there was a failure by the trier of fact "to find upon some material issue involved." (Emphasis omitted.) *People v. Mack*, 167 Ill. 2d 525, 537 (1995). In determining whether a verdict is sufficient, we look at "whether the jury's intention can be ascertained with reasonable certainty from the language used." *Id.* In addition, we should consider and interpret all parts of the record to determine the verdict's meaning. *Id.*

¶ 29   Looking at the entire record necessarily requires us to consider the jury instructions. "The sole function of instructions is to convey to the minds of the jury the correct principles of law applicable to the evidence submitted to it in order that *** [they] may, by the application of proper legal principles, arrive at a correct conclusion according to the law and the evidence." (Internal quotation marks omitted.) *People v. Nere*, 2018 IL 122566, ¶ 29. "Jury instructions should not be misleading or confusing, and their correctness depends on whether 'ordinary persons acting as jurors would fail to understand them.' " *People v. Anderson*, 2012 IL App (1st) 103288, ¶ 57 (2012). It is the instructions, in other words, that provide the context for the jury to understand the

verdict forms they receive. And "[w]e presume that the jurors understood and followed the instructions given them." *People v. LeCompte*, 260 Ill. App. 3d 61, 65 (1994).

¶ 30    In this case, two instructions specific to the offense of home invasion were provided. The first gave the definition of home invasion, while the second specifically listed the five elements the State needed to prove in order to sustain a charge for that offense, the fifth of which was, "[t]hat while armed with a dangerous weapon the defendant, or one for whose conduct he is legally responsible, used force on *Jamar Conner*, a person within the dwelling place." (Emphasis added.) Considering the plain language of the instructions on home invasion, an ordinary person acting as a juror would understand that they were considering whether Amelia was guilty of home invasion based solely on the force used against Jamar. There was simply no instruction presented that asked the jury to consider home invasion in light of any force used against Arkyisha. Accordingly, Amelia has certainly shown that it is arguable the trial court erred when it entered a finding of guilt and sentence on count 37, the charge of home invasion based solely on use of force against Arkyisha.

¶ 31    We acknowledge that the State mentioned briefly in its closing argument that Arkyisha was also a victim of home invasion. But the fact remains that the State failed to ask for an instruction including Arkyisha as a victim of home invasion.

¶ 32    In response to Amelia's argument that she was improperly convicted of a charge that was not presented to the jury, the State first spends a fair amount of its brief arguing that on direct appeal we found the evidence sufficient to support all her convictions. That is true (see *Carr-McKnight*, 2020 IL App (1st) 163245, ¶ 75), but it is unclear to us, and the State fails to explain, how sufficient evidence overcomes the fact that this charge was never presented to the jury.

¶ 33    In *People v. Biggerstaff*, 287 Ill. App. 3d 813, 814, 819 (1997), we reversed a defendant's

conviction for first degree murder because the jury was not given a not-guilty verdict form for the lesser-included offense of involuntary manslaughter, which was also at issue. We explained that "[n]o matter how obvious a defendant's guilt, no matter how overwhelming the evidence, no matter what his lawyer thinks or tells the jury, the constitution entitles him to a jury verdict that decides guilt or innocence." *Id.* at 814-15. Similarly, in *Sullvan*, 508 U.S. at 279-80, the United State Supreme Court stated that "to hypothesize a guilty verdict that was never in fact rendered— no matter how inescapable the findings to support that verdict might be—would violate the jury-trial guarantee." See also *People v. Crite*, 261 Ill. App. 3d 1041, 1046 (1994) ("It was not the trial court's function, nor is it ours, to speculate on the jury's verdict."). Here, the jury was not given an opportunity to render a verdict of guilt *or* innocence on the charge of home invasion based on force used against Arkyisha, and we will not hypothesize as to what the jury would have done were they so instructed. Regardless of the evidence on that charge, Amelia has presented the gist of a claim that this conviction cannot stand.

¶ 34    The State also argues that Amelia forfeited this claim because she failed to raise it on direct appeal and failed to couch it in terms of ineffective assistance of appellate counsel in her petition. It is true that, generally, a claim that was not raised in a postconviction petition cannot be raised for the first time on appeal from dismissal of that petition. *People v. Smith*, 2023 IL App (1st) 221496, ¶ 23. However, it was not until after this court issued its decision on direct appeal that this claim became, for any practical purpose, worth raising. In the trial court, Amelia was sentenced to 21 years on each count of home invasion *to be served concurrently*, with the two home invasion sentences to run consecutively with the 30-year sentence for murder. At the time of her direct appeal, there was no reason for her appellate counsel to seek to vacate the home invasion conviction under count 37—based on a use of force against Arkyisha—since the sentence imposed

on that count was concurrent to the sentence imposed on count 38. It was only when this court, *sua sponte*, vacated the conviction on count 38 on direct appeal, that Amelia had reason to seek to vacate her conviction on count 37 on a charge that was never submitted to the jury, which is now the only reason that she is serving a 21-year consecutive sentence for home invasion.

¶ 35    Because we find that Amelia has made an arguable claim that her right to due process was denied when a conviction for home invasion was entered against her that was never submitted to the jury or found proven beyond a reasonable doubt, we need not address her remaining claims. See *People v. Rivera*, 198 Ill. 2d 364, 374 (2001) (partial dismissals of a postconviction petition at the first stage of proceedings "are not permitted under the Act").

¶ 36                                        IV. CONCLUSION

¶ 37    For the foregoing reasons, we reverse the circuit court's summary dismissal of Amelia's postconviction petition and remand for second-stage proceedings.

¶ 38    Reversed and remanded.